## Case No. 8,434.

### · LLOYD v. SCOTT.

#### [4 Cranch, C. C. 206.] [1]

Circuit Court, District of Columbia. May Term, 1832.

REAL PROPERTY—RENT CHARGE—LANDLORD AND TENANT—DISTRESS FOR RENT—REPLEVIN —AVOWRY—PLEAS IN BAR.

1. A rent-charge or annuity of $500 a year in consideration of $5,000 advanced and paid therefor, is not usurious on the face of the grant, although it contain the following covenants, namely, that the grantor will pay the said rent as it shall become due; and if not punctually paid, that the grantee may enter and distrain therefor; and that if the rent shall remain thirty days unpaid, and no sufficient distress found on the premises charged, the grantee may enter and from thence remove and expel the grantor, his heirs and assigns, and hold and enjoy the same as his absolute estate forever thereafter; that the grantor will keep the buildings insured against fire, and will execute and deliver any further conveyance necessary more completely to charge the premises with the said annuity and to carry into effect the intention of the parties. And a covenant on the part of the grantee, that if the grantor at any time after the expiration of five years, should pay to the grantee $5,000 and all arrears of rent, the grantee would execute and deliver, to the grantor, any deed or instrument necessary for releasing and extinguishing the said rent or annuity; which, on such payment, shall thereafter forever cease to be payable.

2. Nor is it a good plea in bar of an avowry of distress for rent due by such a grant, that the deed was made in pursuance of an agreement that the grantee should "advance" to the grantor $5,000, in consideration of which the grantor should, by such a deed grant to the grantee an annuity or rent of $500 with the covenants aforesaid; although the plea aver that "so" the said deed was made "in consideration of money advanced upon and for usury:" "and there has been reserved and taken above the rate of six dollars in the hundred for the forbearance of the said sum of $5,000 for the term of one year.

3. Nor is it a good plea in bar to such an avowry to say that the deed was made in pursuance of an agreement that the grantee should "lend" $5,000 to the grantor upon the terms and with the covenants contained in the said deed: although the plea aver that "so" the grantor saith the said deed was made "in consideration of money lent upon and for usury:" and that "by the said indenture there has been reserved and taken above the rate of six dollars in the hundred for the forbearance of the said sum of $5,000 so lent as aforesaid for the term of one year."

4. Nor is it a good plea in bar of such an avowry, to say that the said deed was made in pursuance of an agreement that the grantee should "advance" to the grantor $5,000 upon the terms and conditions, and in consideration of the covenants in the said indenture mentioned and contained, "and so the said John saith that the said deed of indenture was made in consideration of money advanced upon and for usury, and that by the said indenture there has been reserved and taken above the rate of six dollars in the hundred for the forbearance of the said sum of $5,000 advanced as aforesaid for the term of one year."

5. Nor is it a good plea, in bar of such avowry, to say. that the said deed was made in pursuance of an agreement that the grantee should "lend" the grantor $5,000 "upon the terms and conditions and in consideration of the covenants and agreements in the said indenture mentioned and contained. and that he did so lend," etc.: "and so

the said John saith that the said deed of indenture was made in consideration of money lent upon and for usury. and that by the said indenture there has been reserved and taken above the rate of six dollars in the hundred for the forbearance of the said sum of $5,000 so lent as aforesaid for the term of one year.

6. There is no rule of law or practice which forbids the court to grant a new trial where the verdict is against the weight of the evidence.

7. A motion for a new trial is an application to the sound legal discretion of the court.

8. The contract prohibited by the statute of usury in Virginia, is a contract to receive something for forbearance; that is, for forbearing to enforce some debt or right; and unless there was a right to demand payment, there could be no forbearance; and if no forbearance, no usury.

Replevin. The defendant, [Charles] Scott, makes cognizance as bailiff of W. S. Moore, and justifies the taking as a distress for $250 rent due under the following grant of an annuity or rent, namely: "This indenture, made this eleventh day of June, in the year one thousand eight hundred and fourteen, between Jonathan Scholfield and Eleanor his wife, of the town of Alexandria, and District of Columbia, of the one part, and William S. Moore of the same town, of the other part, witnesses, that the said Jonathan Scholfield and Eleanor his wife, in consideration of the sum of five thousand dollars to the said Jonathan Scholfield by the said William S. Moore in hand paid, of which the receipt is hereby acknowledged, have granted, bargained, and sold, and by these presents do grant, bargain, and sell, to the said William S. Moore, his heirs and assigns forever, one certain annuity or rent of five hundred dollars, to be issuing out of and charged upon a lot of ground and four brick tenements and appurtenances thereon erected, on the east side of Washington street, and the north of Duke street, in the said town of Alexandria, beginning, &c.. &c., to be paid to the said William S. Moore, his heirs and assigns by equal half-yearly payments—$250 on the 10th day of December and on the 10th day of June forever hereafter: To hold the said annuity or rent to the said William S. Moore, his heirs and assigns, to his and their only proper use forever; and the said Jonathan Scholfield for himself, his heirs, executors, administrators, and assigns, does hereby covenant with the said William S. Moore, his heirs and assigns as follows, that is to say, that he the said Jonathan Scholfield, his heirs and assigns, will well and truly pay to the said William S. Moore, his heirs and assigns, the said annuity or rent of $500, by equal half-yearly payments on the 10th day of June and on the 10th day of December, in each year forever hereafter, as the same shall become due; and that if the same be not punctually paid, then it shall be lawful for the said William S. Moore, his heirs and assigns, from time to time, on every such default, to enter on the premises charged, and to levy, by distress and sale of the goods and chattels there found, the rent in arrear

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

and the costs of distress and sale; and if the same shall remain in arrear and unpaid for the space of thirty days after any day of payment as aforesaid, and no distress, sufficient to satisfy the same, can be found on the premises charged, then it shall be lawful for the said William S. Moore, his heirs and assigns, to enter on the premises charged, and from thence to remove and expel the said Jonathan Scholfield, his heirs and assigns, and to hold and enjoy the same as his and their absolute estate forever thereafter; and further, that the said Jonathan Scholfield is now, in his own right, seized in fee-simple in the premises charged as aforesaid, free from any condition or incumbrance, other than such as are specified and provided for in a deed from the said Jonathan Scholfield to Robert J. Taylor, dated the day before the date hereof; and that the said Jonathan Scholfield, his heirs and assigns, will forever hereafter keep the buildings and improvements which now or hereafter may be erected on the premises charged, fully insured against fire, in some incorporated insurance office, and will assign the policies of insurance to such trustees as the said William S. Moore, his heirs or assigns, may appoint; to the intent, that if any damage or destruction from fire shall happen, the money received on such policies may be applied to rebuilding or repairing the buildings destroyed or damaged. And that he, the said Jonathan Scholfield, his heirs and assigns, will execute and deliver any further conveyance which may be necessary more completely to charge the premises, before described, with the annuity aforesaid, to carry into full effect the intention of the parties hereto; and lastly, that he and his heirs will forever warrant and defend the annuity or rent hereby granted to the said William S. Moore, his heirs and assigns, against any defalcation or deduction for or on account of any act of him, his heirs or assigns. And the said William S. Moore, for himself, and his heirs and assigns, does hereby covenant with the said Jonathan Scholfield, his heirs and assigns, that if the said Jonathan Scholfield, his heirs or assigns, shall, at any time after the expiration of five years from the date hereof, pay to the said William S. Moore, his heirs or assigns, the sum of five thousand dollars, together with all arrears of rent, and a ratable dividend of the rent for the time which shall have elapsed between the half-year's day then next preceding, and the day on which such payment shall be made, he the said William S. Moore, his heirs and assigns, will execute and deliver any deed or instrument which may be necessary for releasing and extinguishing the rent or annuity hereby created, which, on such payment being made, shall forever after cease to be payable. In testimony whereof," &c. Scholfield afterwards sold the premises to the plaintiff, subject to this rent charge.

This cognizance or avowry was filed by the defendant on the 30th of November, 1827;

and the plaintiff (after oyer of the deed) demurred to the cognizance, and assigned the following causes of demurrer: (1) Because the said deed of indenture shows, upon the face of it, a corrupt and usurious contract between Jonathan Scholfield and W. S. Moore, altogether void in law, and entirely incompetent to justify the taking of the said goods and chattels in the plaintiff's declaration mentioned; (2) because the essential parts of the indenture are not set forth in the cognizance; (3) because the indenture is variant and different from that alleged in the cognizance; and (4) because the cognizance is void and insufficient in law to justify the taking of the said goods and chattels.

The defendant joined in demurrer, and (as permitted by the Virginia law of December 12, 1792, p. 80, c. 66, § 39), after oyer of the deed, filed four special pleas: (1) "The said John [Lloyd] saith that the said Charles, as bailiff of the said William S. Moore, for the reasons before alleged, ought not justly to acknowledge the taking of the goods and chattels aforesaid in the said place in which," &c. "Because he saith, that before the making of the said indenture, that is to say, on the 11th day of June, in the year 1814, at the county aforesaid, it was corruptly agreed between the said Jonathan Scholfield and the said William S. Moore, that the said William S. Moore should advance to him the said Jonathan the sum of five thousand dollars, and in consideration thereof that he the said Jonathan and the said Eleanor his wife should grant by a deed of indenture duly executed and delivered to him the said William, his heirs and assigns, forever, a certain annuity or rent of five hundred dollars, to be issuing out of and charged upon a lot of ground and four brick tenements," &c., (describing them as in the deed,) "to be paid to the said William, his heirs and assigns, by equal half-yearly payments," &c., (as stated in the deed); "and it was further corruptly agreed that the said Jonathan, in and by the said deed of indenture, should for himself, his heirs, executors, administrators, and assigns, covenant with the said William, his heirs and assigns, that he would well and truly pay to him the said William, his heirs and assigns, the said annuity or rent of $500," &c., &c., stating all the terms, conditions, and covenants in the very words of the deed. "And the said William did further corruptly agree that he would, in the said indenture, covenant for himself, his heirs and assigns, with the said Jonathan, his heirs and assigns, that if the said Jonathan, his heirs or assigns, should at any time thereafter, at the expiration of five years from the date of the said indenture, pay to the said William, his heirs or assigns, the sum of five thousand dollars, together with all arrears of rent," &c., (in the words of the deed,) "he the said William, his heirs and assigns, would execute and deliver any deeds or instruments which might be necessary for releasing and extinguishing

the rent or annuity thereby agreed to be created, which, on such payment being made, should forever after cease to be payable. And the said John saith that afterwards, namely, on the same day and year, at the county aforesaid, the said William, in pursuance and in prosecution of the said corrupt agreement did advance to the said Jonathan the said sum of five thousand dollars, and the said Jonathan and Eleanor his wife, and the said William did, then and there, make, seal, and duly deliver to each other respectively, the said deed of indenture as their several acts and deeds; which said deed was duly acknowledged by the said Eleanor and admitted to record, and so the said John saith that the said deed of indenture in the said cognizance mentioned, was made in consideration of money advanced upon and for usury; and that by the said indenture, there has been reserved and taken above the rate of six dollars in the hundred for the forbearance of the said sum of five thousand dollars so advanced as aforesaid, for the term of one year; and this the said John is ready to verify: wherefore he prays judgment if he ought to be charged with the rent aforesaid; and inasmuch as the said Charles hath acknowledged the taking of the said goods and chattels, he the said John prays judgment and his damages, on occasion of the taking and unjust detaining of the said goods and chattels to be adjudged to him," &c. (2) The second plea was exactly like the first, except that it charged the agreement to be, that Moore should "lend" to Scholfield $5,000, and that in consideration thereof Scholfield and wife should make the deed; and averred that Moore did, in pursuance and prosecution of such agreement, "advance," (not "lend,") the $5,000; and Scholfield and wife did make the deed, &c.: "and so the said John saith that the said deed of indenture in the cognizance mentioned was made in consideration of money lent upon and for usury, and that, by the said indenture there has been reserved and taken above the rate of six dollars in the hundred for the forbearance of the said sum of $5,000, so lent as aforesaid for the term of one year; and this the said John is ready to verify." &c. (3) The third plea, after oyer of the deed, averred, "that before the making of the said indenture, that is to say, on the 11th day of June, in the year 1814, at the county of Alexandria, aforesaid, it was corruptly agreed between the said Jonathan and the said William, that he the said William should advance to him the said Jonathan the sum of $5,000, upon the terms and conditions and in consideration of the covenants and agreements in the said indenture mentioned and contained; and that in pursuance of the said corrupt agreement, and in the prosecution and fulfilment of the same, the said William did then and there advance to him the said Jonathan the said sum of $5,000; and the said Jonathan and Eleanor his wife, and the said William did then and

there make, and seal, and duly deliver the said deed of indenture to each party respectively as their act and deed; and so the said John saith that the said deed of indenture was made in consideration of money advanced upon and for usury; and that by the said indenture there has been received and taken above the rate of six dollars in the hundred for the forbearance of the said sum of $5,000, so advanced as aforesaid for the term of one year; and this the said John is ready to verify," &c. (4) The fourth plea was exactly like the third, except that it charged the agreement to be, that Moore should "lend" to Scholfield $5,000; and that he did lend him the sum of $5,000; and that the indenture was made in consideration of money lent upon and for usury; "and that by the said indenture there has been reserved and taken above the rate of six dollars in the hundred for the forbearance of the said sum of $5,000, so lent as aforesaid for the term of one year; and this the said John is ready to verify," &c. This suit was commenced in Alexandria, D. C., where all the parties resided; but after the cause had been decided in this court and in the supreme court of the United States, upon the demurrers, and before any issue of fact had been made up, it was at the instance of the defendant's counsel removed to Washington on account of the large interest which many persons in Alexandria were supposed to have in the question, as many such annuities or rent charges had been made, and were supposed to be lawful.

The case first came before the court in Alexandria upon the plaintiff's demurrer to the defendant's cognizance, at November term, 1827, when it was argued by Mr. Swann, for plaintiff, and Mr. Taylor and Mr. Jones, for defendant.

Mr. Swann contended that the contract was usurious on its face, and that it was competent for the court to decide whether it was so or not; and cited Gibson v. Fristoe, 1 Call. 70, 73; Roberts v. Trenayne, Cro. Jac. 507; Richards v. Brown, Cowp. 776; Jestons v. Brooke, Id. 797; Levy v. Gadsby, 3 Cranch [7 U. S.] 180; Act Va. Nov. 23, 1796, p. 367, c. 209; Earl of Chesterfield v. Janssen, 1 Atk. 301; 7 Bac. Abr. 199; Lawley v. Hooper, 3 Atk. 278; 1 Fonbl. Eq. 235; Floyer v. Sherard, 1 Amb. 19; De Butts v. Bacon, 6 Cranch [10 U. S.] 253; Ellzey v. Lane, 4 Munf. 66.

Mr. Taylor and Mr. Jones, contra. The intent must be found, but it does not appear upon this demurrer. The court cannot infer the intent. The question is whether there be a loan, or a forbearance of an antecedent debt. If it be an annuity it is not usury. This is the purchase of an annuity. There was no obligation upon Scholfield to return the purchase-money. It was never payable, and can never be recovered. There is no difference between a rent-charge and an annuity, as to the question of usury. The price

of this annuity is the usual market price, and nothing contrary appears on the face of the deed. The question is, whether it was a bonâ fide sale of an annuity, or a cover for a loan. Ord, Usury, 74, 75.

Mr. Swann, in reply. This is different from an ordinary ground-rent. Here is a personal covenant to pay the rent. Insurance of the houses and assignment of the policy, &c.

Before CRANCH, Chief Judge, and THRUS-TON, Circuit Judge.

THE COURT (nem. con.) was inclined to the opinion that the contract was not usurious upon its face, but at the request of Mr. Swann took time to consider until the next term; when

CRANCH, Chief Judge, delivered the opinion of the court, after stating the substance of the deed of 11th of June, 1814, and the cognizance. To this avowry the plaintiff demurred, and insisted that the transaction was usurious upon the face of the deed. That the court may decide an instrument or contract to be usurious upon its face is not denied, but then the court cannot look to any thing out of the instrument.

It is contended that this contract was substantially a loan, and to this effect the following cases were cited:

(1) Roberts v. Trenayne, Cro. Jac. 507. That case was trespass quare clausum fregit, against the grantee of a rent-charge for entering for non-payment of the rent. But there the jury expressly found it to be a loan of £150 at an interest of £22 10s. per annum, and that security was given for the repayment. It was objected, that the jury had not found that it was corruptè agreatum. But the court said it was sufficient if they found all the circumstances which made it apparent to the court to be usurious, for "res ipsa loquitur." And Justice Dodridge said, "If I secure both interest and principal, if it be at the will of the party who is to pay it, it is no usury."

(2) Richards v. Brown. Cowp. 770. This was a case of an annuity forced upon a needy debtor, who came to borrow money. The court decided, from all the circumstances given in evidence at the trial, that the substance of the contract was a borrowing and lending, and that a slight colorable contingency will not take the case out of the statute. The circumstances were very strong to show the annuity to be a mere cover for an usurious loan; none of which circumstances appear, in the present case, as it appears upon the indenture.

(3) Jestons v. Brooke, Cowp. 797. This case was decided not to be usury, but to be an inequitable demand, and, therefore, not recoverable in an action for money had and received. It does not affect the present case.

(4) Levy v. Gadsby, 3 Cranch [7 U. S.] 186, was cited to show "that the construction of written evidence is exclusively with the court," who may decide on the face of a written instrument, that it imports a usurious contract.

(5) Earl of Chesterfield v. Janssen, 1 Atk. 301–305, 1 Wils. 295. In consideration of £5,000 advanced to Mr. Spencer, he bound himself to pay £10,000 at the death of the Duchess of Marlborough, in case he should survive her. It was decided not to be usury. Mr. Justice Burnett, in page 340, said, "Suppose a man purchase an annuity at ever such an under price, if the bargain was really an annuity, it is not usury. If on the foot of borrowing and lending money, it is otherwise; for if the court are of opinion the annuity is not the real contract, but a method of paying more money for the reward or interest than the law allows, it is a contrivance that shall not avoid the statute. A bargain on a mere contingency, where the reward is given for the risk, and not for the forbearance, is not usurious; for how can it be said, with any propriety, to be for forbearance when the day of payment may never come." Although the case is very long, this is all that seems pertinent to the present case; and this is only the assertion of a general principle which is not denied.

(6) Lawley v. Hooper, 3 Atk. 278. This was a bill to redeem an annuity granted for the life of the grantor. By the contract it was redeemable upon the payment of £1,050, the original sum given for the annuity, and £75, and all arrears of the annuity. Upon all the circumstances of the case, Lord Chancellor Hardwicke was inclined to think it was "a loan of money turned into this shape to avoid the statute of usury," but he did not think it necessary to determine that point; being of opinion that it was such an agreement as the court ought not to suffer to stand, taking it as an absolute sale. After the parties had agreed upon the terms of the annuity, and the deed was drawn and ready to be executed, the grantee insisted, that as there was no time limited after which only the grantor might redeem, he should, in case he determined to redeem, pay him £75 more than the original purchase-money of the annuity. This was assented to by the grantor, on account of the pressure of his affairs. The lord chancellor considered this variation of the agreement as "unreasonable," and, therefore, set aside the whole agreement, and considered it as a simple loan of £1,050 upon a lawful interest, and permitted him to redeem upon payment of that sum and interest; the payments of the annuity to be credited so as first to sink the interest and then the principal. There is nothing in that case to affect the present. The dictum of the lord chancellor, that it was to be taken to be a loan of money, was founded upon all the circumstances of the case; not upon the face of the instrument alone.

(7) Floyer v. Sherard, 1 Amb. 19. This case is cited for the dictum of Lord Chancellor Hardwicke, that when annuities "are

redeemable, the court looks upon it as an evasion of the statute of usury, and only a loan of money." It does not appear whether, by the word "redeemable," he meant redeemable at the option of the grantor alone, and where the grantee could not compel the grantor to redeem. If that was his meaning, the dictum is opposed by several cases in which that circumstance was not deemed sufficient to establish the contract as a loan; and is confirmed by none. See Murray v. Harding, 3 Wils. 390, 2 W. Bl. 859. See, also, the above case of Lawley v. Hooper, where, if the clause of redemption were conclusive of the fact of its being a contract for a loan, Lord Hardwicke would probably have placed his opinion upon that ground, and not "upon all the circumstances of the case." See, also, Rex v. Drury, 2 Lev. 7. And in Earl of Chesterfield v. Janssen, 1 Wils. 295, the same Lord Hardwicke says, "To make a contract usurious, there must be a loan to be repaid at all events with higher interest than the statute permits." See, also, Fountain v. Grymes, Cro. Jac. 252.

(8) Fountain v. Grymes, Cro. Jac. 252, 1 Bulst. 36. This was a case of annuity for two lives, "and there being no agreement to have the principal money," it was resolved that it was not usury; "but if there had been any provision made for repayment of the principal, although not expressed within the bond, it had been an usurious agreement."

(9) Rex v. Drury, 2 Lev. 7. "Brown had a lease of a messuage from the Earl of Suffolk for forty years, at £5 per annum rent. Brown agreed to assign this term to Drue for £300, but Drue, not having the money, Drury, by agreement with Drue, paid the £300, and took the assignment to himself. Drury then demised the messuage to Drue for thirty-nine and three quarter years, at the rent of £35, of which £5 were to be paid to the Earl of Suffolk, and the remaining £30 to Drury for his own use. Drue covenants to pay the rent, and other usual covenants for repairs. &c.; and Drury covenants, that if at the end of four years, Drue should pay him £300, then the rent shall cease, and he will convey to Drue the residue of the term. And, by Hale, C. J., this was not usury within the statute, for Drue was not bound to pay the £300 to Drury; but, at his election, he might pay this if he would, and thereby determine the rent and have the term; so that it is, in fact, but a bargain for an annuity of £30 per annum for thirty-nine and three quarter years for £300 to be secured in this manner, but determinable sooner at the will of the grantor; but the grantee has no remedy to have again the £300, unless the grantor please to pay it at the end of four years. But if Drury had had any security for the repayment of the £300, or by any collateral agreement this was to be repaid. and this manner of contract contrived to avoid the statute, it would have been otherwise."

(10) Doe v. Chambers, 4 Camp. 1. In this case, Trustram, the borrower of £300 and £600, making £900 from Chambers, assigned a lease, worth £2,000, to Chambers, as security, and took an under-lease from Chambers for seven years, at a rent of £70 per annum. Trustram covenanted to keep the premises in repair, and to pay the insurance and the landlord's taxes. Chambers covenanted that, upon repayment of the £900 within the seven years, he would reassign the lease to Trustram. Lord Ellenborough, at nisi prius, thought that the covenant to reassign on payment of the £900 was evidence that the real contract was a loan, and not an annuity, and so instructed the jury. The cases, already cited, show that that circumstance alone is not sufficient to make the contract usurious. None of those cases were cited at the trial of that cause. It was an off-hand dictum. at nisi prius; and there were other circumstances, which showed that the whole object of the contract was security for a loan. The assignment of the lease was a security for the repayment of the principal. The chief justice stated the evidence to the jury; not the law.

(11) Ex parte Aynsworth. 4 Ves. 678. This was an agreement to allow 30¼ per cent. discount for prompt payment of a bleacher's bill. The debtor had become bankrupt, and the commissioners allowed, as I understand the case, an interest of 5 per cent. on the smaller sum only; that is, they deducted 30¼ per cent. upon the bill rendered, and allowed .5 per cent. interest upon the balance. The creditors petitioned the chancellor to be allowed to prove the additional 25¼ per cent., and relied on the custom of the trade; but the chancellor refused, saying, "The custom of the trade cannot make the debt more than the money really advanced, with 5 per cent. The creditor cannot have more than 5 per cent. The commissioners have done right." Petition dismissed.

(12) Barker v. Van Sommer, 1 Brown, Ch. 149. This was a loan of silks to be sold by a young man to raise money. Lord Chancellor Thurlow considered it as a loan of the sum for which he sold the goods; and set aside the bond given for their estimated value, as being usurious.

(13) Lowe v. Waller, 2 Doug. 736, was a case of the same kind, at law, in which a bill of exchange given for the estimated value of the goods was deemed usurious and void; it being considered as a cover for a loan of the sum actually raised by the sale of the goods.

(14) Davis v. Hardacre, 2 Camp. 375. In this case the discounter of a bill required the other party to take part of the payment in goods, and it was held that this raised a presumption that the transaction was usurious.

(15) Lee v. Cass, 1 Taunt. 515. Upon discounting a bill. the discounter required that he should be permitted to guaranty the sol-

vency of the acceptor, and should receive for that guaranty a premium of 3½ per cent. This was held to be usury.

These are all the cases which have been cited, in behalf of the plaintiff. The five last-mentioned cases have no bearing upon the present, other than to show, that wherever the real object of a contract is the loan of money at a greater interest than the law allows, it will be deemed usurious. Upon the present demurrer, no facts are brought into view but those which appear in the deed granting the rent-charge. Here was no previous conversation about a loan of money; no purchase of an annuity at an under price; no remedy to recover the principal; no annuity forced upon a needy debtor to cover a loan; no forbearance; no day of payment. It has never been decided, that the grantor's right of redemption, alone, made the contract usurious; but the contrary has been expressly adjudged. Rex v. Drury, 2 Lev. 7; Murray v. Harding, 2 W. Bl. 859, 3 Wils. 390; Fountain v. Grymes, Cro. Jac. 252, 1 Bulst. 36. The covenant, that in case the rent be in arrear for thirty days and no sufficient distress be found, the grantee might enter and expel the grantor and hold and enjoy the premises as his absolute estate, is believed to be a covenant usually inserted in the grant of a rent charge; and would, in equity, if not at law, be considered as an authority only to enter and hold to satisfy the rent, and as a security therefor. 3 Cruise, Dig. 300 (198) tit. 28, c. 1, § 73. The other covenants in the deed do not seem to affect the question of usury, otherwise than by corroborating the idea of a sale of an annuity, rather than that of a loan of money.

Upon the whole, we are of opinion, upon this demurrer, that it is not a case of usurious loan, but of a fair purchase of an annuity or rent charge; and as this is the only point argued and submitted to the court, the judgment must be for the defendant.

After this opinion was delivered, namely, at November term, 1828, the defendant demurred to the plaintiff's four pleas of usury, and the plaintiff joined in demurrer, and the case was submitted without argument to the court, who rendered judgment for the defendant, being of opinion that the case was not varied by the new pleadings, because every plea refers to the written contract which, the court had decided, purported upon its face to be a sale of an annuity or rent-charge, and not a loan, as there never was a day of payment, and therefore no forbearance. The plaintiff obtained a writ of error to the supreme court of the United States, who affirmed the opinion of this court as to the construction of the deed of the 11th of June, 1814; but reversed the judgment of this court upon the defendant's demurrer to the plaintiff's second and fourth pleas of usury. [Lloyd v. Scott] 4 Pet. [29 U. S.]

205. Upon the coming down of the mandate, at November term, 1830, the cause, as before stated, was removed to Washington for further proceedings; the demurrer to the plaintiff's second and fourth pleas being withdrawn, and issue joined thereon by the defendant. At May term, 1831, at Washington, the cause came on for trial upon the issues of fact joined upon the second and fourth pleas; but the jury could not agree upon a verdict, and the cause was continued until May term, 1832, when a verdict was rendered for the plaintiff.

The defendant moved for a new trial, on the ground that the verdict was against the weight of the evidence. After argument, THE COURT (MORSELL, Circuit Judge, absent) intimated a strong opinion in favor of the motion, on the ground that the verdict, if not absolutely against evidence, was against an irresistible weight of evidence.

CRANCH, Chief Judge, however, said that the motion for a new trial might stand open until he could have time to look minutely into the notes of evidence taken by the parties, and into the law of the case. And it was agreed that his opinion should be given in writing by the 1st of October then next, so that if a new trial should be granted, the parties should have time to prepare for it.

In pursuance of that agreement, on the 25th of September, 1832,

CRANCH, Chief Judge, delivered and filed the following opinion, (after stating the second and fourth pleas upon which the issue was joined,) namely: To each of these pleas there was a general replication and issue, and verdict for the plaintiff. The defendant has moved for a new trial, and assigned, as reasons therefor: (1) Because the court misdirected the jury as to the law applicable to the case. (2) Because the jury misconceived the instructions given to them by the court. (3) Because the verdict was against law. (4) Because the verdict was against evidence. (5) Because the verdict was without evidence.

1. In regard to the instructions of the court to the jury, as bills of exception have been taken, the court will not grant a new trial on that ground, although there may be some doubt whether Mr. Scholfield's testimony should have been admitted.

2. As the verdict was general, we have no means of ascertaining whether the jury misconceived or disobeyed the instructions of the court; but if the evidence did not justify the verdict under those instructions, it may be presumed that the jury misunderstood or disregarded them.

3. If the verdict was justified by the evidence and the instructions of the court, it cannot be considered as a verdict against law.

4. The fourth reason assigned is, that the verdict was against evidence. If this was the case, a new trial ought to be granted.

It is objected, that there was evidence on both sides, and therefore the verdict cannot

be said to be against evidence; and if the verdict was merely against the weight of evidence, the court cannot grant a new trial. But there is no rule of law or practice, which forbids a court to grant a new trial where the verdict is against the weight of the evidence. On the contrary, there have been many new trials granted on that ground. A motion for a new trial is an application to the sound legal discretion of the court. They will not always grant a new trial when the verdict is against the evidence; nor will the court always refuse it where there was evidence on both sides, to be weighed by the jury.

If the evidence be doubtful, and great interests are involved; if the verdict be conclusive; if it goes to enforce a forfeiture, or to affect the reputation of the party, or to charge him with a criminal offence; or to unsettle titles, or to destroy securities deemed valid; if it be a hard verdict, and seem to the court unjust; all these are considerations to guide the discretion of the court. The court has been reminded of the case of Ross v. Gill, 1 Wash. [Va.] 90, where the court of appeals of Virginia say, "If the court admit improper evidence, an exception may be taken to their opinion; but if the question depend upon the weight of testimony, the jury, and not the court, are exclusively and uncontrollably the judges." But this is not said by the court in reference to a motion for a new trial; for none was made in that case; it was said, and it is true in regard to the relative functions of the court and the jury upon the trial of the issue; and it is because the jury are exclusively and uncontrollably judges of the fact, that the power to grant new trials is given to the court. The court has also been referred to the case of Bogle v. Sullivant, 1 Call, 561. There, the court below had refused to instruct the jury, that evidence of the handwriting and death of the subscribing witnesses to a bond, was, upon the issue of non est factum, sufficient proof of the execution and delivery of the bond; "but left it to the jury to determine the weight of such evidence." The judgment was affirmed by the court of appeals, who said: "The court sees no difference between this and other cases where the evidence is admitted, and the weight it ought to have is left to the jury, who have a right to decide it." There was no question respecting a new trial. The case of Fehl v. Good, 2 Bin. 495, has also been cited, in which C. J. Tilghman says: "The character of witnesses, and the credit that is due to them, are subjects peculiarly within the province of the jury; and where the verdict has depended upon these points, the court has always refused to interfere, except in extraordinary cases." The case of Griffith v. Willing, 3 Bin. 317, 320, has also been cited. In that case, the fact of partnership depended upon a mass of testimony, written and parol. It did not appear to the judge as it did to the jury. The subject was

complicated, and the chief justice, although the verdict was contrary to his expectation, thought best not to disturb it. Judge Yeates was not satisfied with the amount of damages; but, viewing the verdict in all its different aspects, he could not say that it presented so plain a case of mistake, of law or fact, in the jury, as would justify the interposition of the court. "The facts," he says, "are much complicated, and we cannot wonder that different inferences should be drawn from them by different minds." This was a question entirely to the discretion of the court. The case establishes no principle. The case of Cowperthwaite v. Jones, 2 Dall. [2 U. S.] 55, has also been cited, where Judge Shippen, in delivering the opinion of the court, said: "New trials are frequently necessary for the purpose of obtaining complete justice; but the important right of trial by jury, requires that they should never be granted without solid and substantial reasons; otherwise the province of jurymen might be often transferred to the judges, and they, instead of the jury, would become the real triers of the facts. A reasonable doubt, barely, that justice has not been done, especially in cases where the value or importance of the cause is not great, appears to me to be too slender a ground for them. But whenever it appears, with a reasonable certainty, that actual and manifest injustice is done, or that the jury have proceeded upon an evident mistake, either in point of law or fact, or contrary to strong evidence, or have grossly misbehaved themselves, or have given extravagant damages, the court will always give an opportunity, by a new trial, of rectifying the mistakes of the former jury, and of doing complete justice to the parties." The case of Cogswell v. Brown, 1 Mass. 237, only decides the general principle, that a new trial ought not to be granted upon a formal objection, where substantial justice has been done, nor where the party has, under a statute of Massachusetts, a right, in certain circumstances, to a "review," which is, in effect, a new trial at law.

These cases do not show any positive rule of law or practice which prevents a court from granting a new trial, on the ground that the verdict was against the weight of evidence. On the contrary, it will be found that almost all the cases in which new trials have been granted because the verdict was against evidence, have been cases where there was evidence on both sides, and the verdict was against the weight of evidence. In the case of Bright v. Eynon, 1 Burrows, 393, Lord Mansfield says: "Trials by jury, in civil causes, could not subsist now without a power, somewhere, to grant new trials. If an erroneous judgment be given, in point of law, there are many ways to review and set it right. Where a court judges of fact, upon depositions in writing, their sentence or decree may, many ways, be reviewed and set right; but a general verdict can only be

set right by a new trial, which is no more than having the cause more deliberately considered by another jury, when there is a reasonable doubt, or perhaps a certainty, that justice has not been done." "Most general verdicts include legal consequences as well as propositions of fact; in drawing these consequences, the jury may mistake, and infer directly contrary to law. The parties may be surprised by a case falsely made at the trial, which they had no reason to expect, and therefore could not come prepared to answer. If unjust verdicts obtained under these, and a thousand like circumstances, were to be conclusive forever, the determination of civil property, in this method of trial, would be very precarious and unsatisfactory. It is absolutely necessary to justice, that there should, upon many occasions, be opportunities of reconsidering the cause by a new trial. "For a good while," "the granting of new trials was holden to a degree of strictness so intolerable, that it drove the parties into a court of equity;" "and therefore, of late years, the courts of law have gone more liberally into the granting of new trials, according to the circumstances of the respective cases; and the rule laid down by Lord Parker, in the case of Queen v. Corporation of Helston [10 Mod. 202], seems to be the best general rule that can be laid down upon this subject, namely: 'Doing justice to the party, or, in other words, attaining the justice of the case.' The reasons for granting a new trial must be collected from the whole evidence, and from the nature of the case, considered under all its circumstances." Mr. Justice Dennison added, "That it would be difficult, perhaps, to fix an absolutely general rule about granting new trials, without making so many exceptions to it as might rather tend to darken the matter than to explain it; but the granting a new trial, or refusing it, must depend upon the legal discretion of the court, guided by the nature and circumstances of each particular case, and directed with a view to the attainment of justice." Mr. Justice Foster "agreed to the propriety of what had been said as to such cases in which the juries give verdicts against evidence, and even to cases where there may be a contrariety of evidence, but where the evidence upon the whole, in point of probability, greatly preponderates against the verdict, which, depending upon a variety of circumstances, is matter of legal discretion, and cannot be brought under any general rule. But in all cases where the evidence is nearly in aequilibrio, he declared that he should always consider himself bound to have regard to the finding of the jury; for, ad quaestionem facti respondent juratores. In such a case, it is not the province of the judge to determine; it ought to be left to the jury."

In the case of Steinmetz v. Curry. 1 Dall. [1 U. S.] 234, Chief Justice McKean says:

"Granting new trials depends upon the legal discretion of the court, guided by the nature and circumstances of each particular case. The courts of England have granted them where the jury have found a general verdict, and the court has directed a special one. So, where the verdict is against the strength of the evidence, and the trial is peremptory; and where the matter appears to the court to deserve reëxamination, they have likewise frequently ordered a new trial. In the present case the verdict appears to be against the strength of the evidence." A new trial was granted. So, in the case Jackson v. Sternbergh, 1 Caines, 167, Mr. Justice Thompson, in delivering the opinion of the court, said: "The testimony is certainly very contradictory, but none of the witnesses appear to have been impeached. Their testimony, however, may make a very different impression, when put on paper, from what it would to hear them examined. Judging only from the case, the weight of evidence is with the defendant; and, although this, of itself, is not sufficient ground for granting a new trial, in all cases, yet, from the whole that appears, there is well founded reason to believe that justice has not been done, and that another examination of the case ought to be made before the possession is changed. We are, therefore, of opinion that a new trial ought to be granted, on payment of costs." So, in Estwick v. Caillaud, 5 Term R. 425, Buller, J., says: "On an application for a new trial, the only question is, whether, under all the circumstances of the case, the verdict be or be not according to the justice of the case." "If, indeed, the facts be doubtful, and the attention of the jury has been drawn from the consideration of them, that is ground for a new trial; but, if the facts be clear, and those facts have been laid before the jury, we ought not to grant a new trial in order to give the unsuccessful party the chance of obtaining another verdict, if the former verdict be agreeable to the equity and conscience of the case." In Norris v. Freeman, 3 Wils. 39, a new trial was granted because the verdict was against the weight of evidence. So, in Barnewall v. Church, 1 Caines, 235, a new trial was granted upon the same ground, although there was direct and palpable contradictory testimony. So, in Mumford v. Smith, Id. 523, Livingston, J., in delivering the opinion of the court, says: "We would not, willingly, disturb a verdict where there had been no contrariety of testimony, or where the proofs are nearly in aequilibrio; perhaps not unless their decision was most manifestly against the whole evidence. Such, we think, is the case here." The case, however, shows that there was some evidence in support of the verdict; but the court was of opinion that the verdict was against the weight of the evidence, and granted a new trial. In Earl of Mountedgecombe v. Symons, 1 Price, 278, it was decided that a new trial will be granted on questions deciding

important rights, when the judge expressed an opinion, at the trial, contrary to the verdict, although he afterwards reports that he is not dissatisfied with it. In Swinnerton v. Marquis of Stafford, 3 Taunt. 91, it is said, that when there has been only a short time for investigating a question of real property, of a doubtful or obscure nature. and of great value, although conflicting evidence has been left to the jury, and the court does not think their verdict wrong, yet. if the inheritance is to be bound forever, the court will grant a new trial, on payment of costs. The result of all the cases upon new trial is stated by Starkie, Ev. (part 3, p. 435), to be this: "In granting or refusing new trials the courts exercise a discretionary power according to the exigency of the case, upon principles of substantial justice and equity."

The questions, then, which arise for the consideration of the court, in the exercise of its discretion in the present case, are, (1) Whether the verdict is against the justice and equity of the case. (2) Whether the verdict is against the weight of the evidence.

1. As to the justice and equity of the case. Every man has a right to make what contracts he pleases. if not restrained by some law: and justice and equity require that such contracts should be executed, if fairly made. Here no fraud is alleged. Scholfield was not, in any manner, under the power of Moore. It is true. that Scholfield wanted to raise money to finish his houses, and for other purposes; and Moore wished to invest his money in a permanent and productive fund. The circumstances were, by no means, uncommon. No man sells an annuity or ground-rent, unless he wants to raise money; and no man purchases an annuity or ground-rent unless he wishes to invest his money in a productive fund. There is no evidence of any great and particular pressure upon Scholfield at that time; and certainly of none created by Moore. Scholfield, according to his own testimony, went to Moore and told him he wanted to borrow or to raise a sum of money upon an annuity or ground-rent. The market value of ground-rents. in fee, in Alexandria, was known to both parties. to be ten years' purchase; and it is natural to suppose that irredeemable ground-rents in fee, which were always salable at that rate, and which afforded the means of a permanent investment of money, would be more valuable than a ground-rent redeemable at a short period. There was no evidence of any circumstance which made it unconscientious in Moore to accept the offer of Scholfield. Moore wished for a permanent investment. Scholfield wished to redeem the rent in a year; and they finally agreed that he should have a right to redeem it at any time after five years. Surely this was not one of those hard, unconscientious bargains that a court of equity would set aside. It was not the case of a spendthrift heir speculating upon the death of his ancestor; nor of a

debtor writhing under the grip of an unrelenting creditor; nor of a weak and simple man entangled in the net of a crafty one. Each party knew exactly what he was doing. The contract, therefore, if not liable to the objection of usury, was fairly made, and ought to be executed, even if this were a suit between the original parties. But it is not. The present plaintiff bought the property, subject to this incumbrance, and, of course, paid as much less for it as the incumbrance was worth; so that if he now recovers he will have deducted from his purchase-money twice that value. It appears, however, in the evidence, that, to avoid this objection, and to induce and qualify Scholfield to become a witness for him, he has agreed to pay the value of this ground-rent to Scholfield's creditors, in case he should recover in this suit; and, in anticipation of such payment, those creditors have actually released Scholfield from $5,000 of their claims upon him. But. on the other hand, it appears in the evidence, that the present plaintiff is the principal creditor of Scholfield, and will, in fact, (as Scholfield is indebted to him in a much larger sum, and is insolvent,) derive the principal benefit from this action in case of recovery. As between this plaintiff and this defendant, therefore, there is no justice or equity on the side of the plaintiff, even if there were between the original parties to the contract; which, clearly, there is not. It is a maxim in equity, "Nemo locupletari debet alienâ jacturâ." The verdict. therefore. if the contract was not usurious, is against the justice and equity of the case.

2. The next question is, whether the verdict was against evidence, upon the point of usury. The pleas aver that Moore lent Scholfield $5,000, and the issue is joined upon that allegation. The question, then, is, did Moore lend the money to Scholfield? If the real contract between the parties is truly stated in the written instrument. this court, and the supreme court of the United States, have said it was not a loan. Unless there was parol evidence. therefore. from which. in connection with the written, the jury could reasonably infer a different contract. the verdict, which could only be justified by proof of a loan. was against the weight of the evidence. The first presumption is in favor of the written contract. When the parties have reduced their agreement to writing, it is primâ facie to be presumed that the writing states the agreement truly, and contains all the terms of the contract. The presumption of law is also always against the allegation of fraud, corruption, and violation of law. He who would add to, or derogate from, a written contract, or who alleges fraud. corruption, and violation of law, should prove his allegations clearly. An agreement. or contract, requires the assent of both parties. The desire. or intent. of one party. to borrow, does not make the contract a loan un-

less the other party intends to lend. There cannot be a loan without an express or implied obligation, on the part of the receiver, to return the thing, either specifically or in kind; and there cannot be a forbearance of that which the party has no right to demand. The contract prohibited by the Virginia statutes of usury (of December 8, 1786, p. 37, and November 23, 1796, p. 367), is a contract to receive something for forbearance, that is, for forbearing to enforce some debt, or right. Unless, therefore, Moore had some right to demand the principal, there could be no forbearance of that principal on his part, and the money he was to receive could not be for forbearance. The words of the act of 1796 are: "That no person, upon any contract, entered into upon or after the first day of May next, shall take directly or indirectly, for loan of any money, wares, or merchandise, above the value of six dollars, for the forbearance of one hundred dollars for a year, and after that rate for a greater or lesser sum, or for a longer or shorter time; and all bonds, contracts," &c., "thereafter to be made for payment or delivery of any money or goods so to be lent, on which a higher interest is reserved or taken than is hereby allowed, shall be utterly void."

This court and the supreme court have decided, that neither the covenant by Moore to extinguish the rent after five years, upon the receipt of $5,000 and all arrearages of rent, nor the right of entry and distress, made the contract a loan. By what evidence, then, did the jury arrive at the conclusion, that the contract was for a loan, and not for the purchase of a ground-rent? It appeared, by the written instrument, that Scholfield, in consideration of $5,000, bargained and sold to Moore, an annuity or rent of $500 in fee, charged upon certain houses and lots in Alexandria, with the right of distress, and of entry and eviction, in case the rent should be in arrear. Scholfield covenanted to pay the rent, and keep the houses insured; and Moore covenanted that if, at any time after five years, Scholfield should pay to Moore the sum of $5,000 with all arrears, Moore would execute a release of the rent. In order to show that this transaction was a loan, and not, as it purports to be, a sale of a rent-charge, the plaintiff produced Scholfield himself as a witness, made (in the opinion of the court,) competent by certain releases, who testified that, being in want of money for various purposes, he went to Moore and told him that he wished to borrow or to raise $5,000 upon an annuity or ground-rent, upon his row of houses, or some of them. He was not certain that he used the term "borrow," but thinks his language was to "borrow or raise." That he did not wish to sell the houses, but wished to have the privilege of returning the money, and extinguishing the annuity after one year. That Moore proposed that the annuity should be irredeemable for ten

years; but finally agreed that he should have the privilege of returning the money and extinguishing the annuity after five years. He thinks, but he is not certain, that the agreement was made in Moore's counting-room. That he afterwards met Moore at Mr. Taylor's office, and the deed was executed a few days after that meeting.

This testimony, with that of Alexander Moore, who stated that W. S. Moore was generally reputed to be a lender of money, and the fact admitted or proved, that Scholfield was a man of a speculative turn, and was in the habit of borrowing money, was the principal, if not the only evidence produced on the part of the plaintiff, to support the allegation that the money was lent. But, instead of proving a contract different from that stated in the written instrument, it seems to me strongly to corroborate it. Nothing was said between the parties respecting a loan. No previous debt existed. No debt was raised at the time. Scholfield, according to his own testimony, wanted to raise the money on an annuity, charged upon his houses. This was his first offer. Whether he used the term "borrow," or not, is quite uncertain, and is wholly immaterial, because it appears by his own testimony that he offered a ground-rent; and that Moore did not desire a return of the money; and that there was no promise nor engagement, either in honor or law, on the part of Scholfield, to return it. According to Scholfield's account of the matter, it seems to me to be as clear and valid a sale of a ground-rent, as it would have been if he had been previously the owner of a ground-rent and had sold it to Moore at ten years' purchase, in the same manner as ground-rents were selling almost daily in Alexandria. There was inadequacy of price. Ten years' purchase had been the uniform market price of ground rents in fee, for many years. The right of redemption was not, of itself, evidence of a loan. That point was decided by this court, and by the supreme court. It was a privilege reserved, by Scholfield, entirely for his own benefit. It imposed no obligation upon him to refund the money. It gave no right to Moore to demand it. The right to distrain, and to enter for the non-payment of the rent, and the covenant to insure the houses, were only intended to secure the rent, not a return of the money. Nor does the right of redemption, taken in connexion with the parol evidence, justify an inference that the transaction was a loan; for the parol testimony, as before observed, corroborates the written evidence. There is no repugnance, nor discrepancy, between them. There is no evidence of a pre-existing debt, nor of a newly-created debt. There was never a time when the $5,000 was a debt due by Scholfield to Moore. There was not, therefore, and could not be, any forbearance of the $5,000 by Moore, even as the contract is represented by Scholfield himself.

The fact, that Moore was reputed to be a

lender of money, cannot, of itself, justify an inference that the transaction was a loan; and even if such an inference could be drawn from such a reputation, it would be rebutted by the particular evidence of the transaction given by Scholfield himself, whose testimony seems to me to justify the strongest inference that no loan was intended; but that both parties understood it as the ordinary transaction of sale of a ground-rent. I thought, at the trial, and still think, that the testimony of Mr. Scholfield, instead of impeaching the bona fides of the written instrument, strongly confirms it. Viewing the subject in this light, it seems to me that the verdict is not merely against the weight of the evidence, but against the whole evidence. I deem it unnecessary, therefore, to recur to the strong and clear testimony of Mr. Taylor, who was the agent of Mr. Moore in the negotiation, and who established, to my satisfaction, the bona fides of the transaction, as the purchase of a ground-rent; and negatived all intention on the part of Moore, to lend the money, or to advance it with a view to repayment. I think the whole evidence shows that Moore did not wish to lend the money, but desired and intended to invest it in a permanent fund.

But it is said, that the terms were so hard upon Scholfield as to be equivalent to an obligation on his part to refund the $5,000; and that Moore relied upon the pressure of those terms for a return of his money. But the terms of the sale of the ground-rent were not so hard as they have been represented. They were the usual terms upon which ground-rents were then, and had for twenty years, been sold in Alexandria; and Scholfield might, at almost any time, have purchased equivalent grount-rents at the same price. It is evident, that the more beneficial the contract was to Moore the less desirous would he be that the money should be returned; and the less would be the probability that he would require any engagement on the part of Scholfield, either legal or honorary, to return it; or that he would reserve a right to demand it; and unless there was some sort of an obligation on the part of Scholfield to return it, and some sort of a right on the part of Moore to demand it, there could be no forbearance; nor could there be a contract for forbearance of that which could not be forborne. This indenture was not an assurance made for payment of the $5,000. Moore could not, in any form of action upon this instrument, recover that money. It was only an assurance for the rent, not for the purchase-money. It is not, therefore, such an assurance as is made void by the statute. It is objected, also, and it is true, that the evidence shows it to be an investment of money at ten per cent. per annum; but it does not follow that it was a loan. If a man should buy six per cent. corporation stock of Washington at seventy-five per cent. it would be an investment of money at eight per cent. per annum; yet it would not be usury. It is also objected, that when

the court, without expressing an opinion upon the evidence, have said it was for the jury to decide upon it, and left it to the jury, saying it is their province to do so, a new trial ought not to be granted, however slight the evidence may be upon which the verdict was founded; and that to set it aside upon the very point upon which the court has said it is the peculiar province of the jury to decide, and upon the very point left by the court to them to decide, is the exercise of a power that cannot be sustained by authority.

But it should be remembered, that the court is bound to submit all facts in issue to the jury. The court could not do otherwise. If there be any evidence, however slight, tending to prove the fact, and the court is not called upon to tell the jury that there is no evidence of the fact, the matter must be left to the jury. The court is not permitted to tell the jury which scale preponderates. If the doctrine contended for be correct, the court could never grant a new trial on the ground that the verdict was against the weight of the evidence. The idea of the effect of leaving a matter to the jury, may have been taken from the practice of the English judges at nisi prius. There, when there is a manifest preponderance of evidence on one side, the judge tells the jury so, plainly; and almost directs their verdict. But when the scales are nearly balanced, or when there has been contradictory evidence, and the verdict depends upon the credibility of the witnesses, the judge gives no opinion upon the evidence; but says he leaves the fact to the jury; and in such case a new trial is generally refused. But here, where all facts are left to the jury without the judge's opinion, it would be strange indeed, if the court should not have the power of granting a new trial where they perceive that the verdict was manifestly against the weight of the evidence. The trial by jury in civil causes, could not long subsist without such a power somewhere, as was justly observed by Lord Mansfield in the case of Bright v. Eynon, before cited. Besides, in a general verdict, the jury undertake to decide the law as well as the facts of the case, and it cannot appear upon which ground they decided. If the facts do not coincide with their inclination, they can bend the law. If the jury understood the law of this case as the court understood it, then it seems to me that the verdict was against evidence. If they understood the evidence as the court understood it, then I think the verdict was against law.

When, therefore, I consider that the verdict takes away the property of the heirs of Moore, to whom it justly belongs if the contract was not usurious, and gives it to one who has no equitable claim to it, that it works a forfeiture and inflicts a penalty for a supposed offence not malum in se but merely malum prohibitum; that it goes to change the relative situation of the parties, and is peremptory as to the property; and when I consider the amount of property dependent upon the prin-

ciples involved in this case; and that the verdict was against the weight of the evidence, it seems to me clear that a new trial ought to be granted, on payment of the costs of the last trial.

THRUSTON, Circuit Judge, concurred in the result of this opinion.