PAN AMERICAN WORLD AIRWAYS, INC., Plaintiff,

v.

F. Ray MARSHALL, U.S. Secretary of Labor, and Weldon Rougeau, Director of Office of Contract Compliance Programs, an agency of the United States Department of Labor, and William Gladden, Director of Civil Rights, Federal Aviation Administration, an agency of the United States Department of Transportation, and Donald Williams, Director of Contract Compliance Programs, Eastern Region, Federal Aviation Administration, an Agency of the United States Department of Transportation, Defendants.

No. 77 Civ. 4416.

United States District Court, S. D. New York.

Oct. 6, 1977.

McCulloch & Denis, New York City, for plaintiff.

Robert B. Fiske, Jr., U.S. Atty., S.D.N.Y., New York City, for defendants; Dennison Young, Jr., Kent T. Stauffer, Asst. U.S. Attys., New York City, of counsel.

BRODERICK, District Judge.

Plaintiff, a contractor [1] with the United States Government, seeks preliminarily to enjoin the Secretary of Labor and the other defendants, all administrative officials of the government, from taking any action, prior to hearings on plaintiff's alleged noncompliance with Presidential Executive Order No. 11246 and regulations thereunder, which will prevent the plaintiff from con-

---

1. "Contractor" is defined in the rules and regulations issued under Executive Order 11246 as follows:

"Contractor" means, unless otherwise indicated, a prime contractor or subcontractor. "Prime contractor" means any person holding a contract and, for purposes of Subpart B of this part (regarding General Enforcement; Compliance Review and Complaint Procedure), any person who has held a contract subject to the Order.

41 C.F.R. § 60–1.3, (as revised).

tinuing to be eligible as a contractor with the federal government.[2]

For the reasons set forth below, I grant plaintiff's application for preliminary injunction to the extent set forth at the end of this decision.

Executive Order 11246 ("the Order") is a presidential directive first promulgated in 1965, and amended from time to time thereafter. The Order prohibits federal contractors from discriminating in employment on the basis of sex, race, color, religion, or national origin.[3] It also requires that contractors take affirmative action on behalf of certain groups. Adherence to the requirements of the Order is, by the terms of the Order, required of government contractors. Regulations promulgated by the Secretary of Labor intended to implement the Order appear at 41 C.F.R. Chapter 60 (1976), as revised (1977).

Plaintiff Pan American World Airlines Inc. ("Pan American") is a New York corporation which maintains commercial air routes throughout the world. It performs under various commercial and defense contracts for the government and is, therefore, subject to the provisions of the Order.

Defendant F. Ray Marshall is the Secretary of Labor ("the Secretary") charged with responsibility for the administration of the Order. Defendant Weldon Rougeau is the director of the Office of Federal Contract Compliance Programs ("OFCCP"), which is an agency of the Department of Labor responsible for the implementation of the Order. The Federal Aviation Administration ("FAA") has been designated by OFCCP to implement the Order and the rules and regulations issued thereunder with respect to entities within its regulatory ken; it is the agency responsible for determining whether or not Pan American is in compliance with the Order. Defendant William Gladden is Director of Civil Rights in FAA, and defendant Donald Williams is Director of Contract Compliance Program for the Eastern Region in FAA.

For some years prior to the commencement of this action, Pan American has performed services pursuant to contracts with various agencies of the government. Included among these was a contract with the National Aeronautic and Space Administration ("NASA") for the operation and maintenance of missile tracking systems at Cape Canaveral in Florida ("the Cape Canaveral contract"), and one with the Military Air Command of the Department of Defense for the transport of military troops and equipment to and from overseas ("the MAC contract"). Both of these contracts by their terms were to expire on September 30, 1977.

Pan American was the low bidder on successor Cape Canaveral and MAC contracts, and was designated as the successful

---

**2.** Plaintiff applied for a temporary restraining order on September 7, 1977. Decision was reserved pending hearing on September 12, 1977. On September 8, 1977, the parties stipulated that no action would be taken by the government in awarding the contracts in issue before September 13, 1977. A hearing on the motion for a preliminary injunction was held September 12, 1977. On September 13, 1977, the parties entered into a further stipulation of no action by the Government effective through September 16, 1977. On September 16, 1977, an additional hearing was held, at which time the parties agreed that the government would take no action on the two contracts before noon on September 19, 1977. At a hearing held September 19, 1977, the government advised me that the Department of Labor had authorized the Air Force to enter into the Cape Canaveral contract with Pan American. Since no resolution had been reached concerning the MAC contract, the September 16 stipulation of

no action was extended through September 20, 1977 as to the MAC contract. At a hearing held September 21, 1977, the government represented on the record that no contract for the MAC transports would be signed before noon on October 4, 1977. The parties subsequently agreed to a 24-hour extension of the no-action stipulation, effective through noon on October 5, 1977. An order granting preliminary relief was issued by me on October 5, 1977, in accord with this opinion to follow. The parties entered into a stipulation staying the effect of the order and extending the stipulation of no action by the Air Force through October 6, 1977 at 3 p.m.

**3.** Exec. Order No. 11246, § 202(1), 30 Fed.Reg. 12319 (1965), *as amended by* Exec. Order. No. 11375, 32 Fed.Reg. 14303 (1969) *reprinted in* 42 U.S.C. § 2000e app. (1974).

contractor by each of the agencies concerned, subject to the necessary internal government approvals. The new Cape Canaveral contract by its terms would run for three years from October 1, 1977, and would entail a gross revenue to the contractor of $229,000,000; the MAC contract by its terms would run for a period of one year from October 1, 1977 and would entail a gross revenue to the contractor of $29,000,000.

As of the time this action was brought, these contracts had not been signed by the government agencies involved because the requisite internal government approvals had not been forthcoming.

4. Pan American's current policy provides that a flight attendant, on learning she is pregnant, must immediately notify her supervisor. She is then put on unpaid maternity leave and must remain on leave until at least 60 days after delivery. In addition, the flight attendant is not permitted to apply any sick days she may have accrued toward her regular maternity leave, and she may not accrue seniority during this period as she would if she were to take a medical leave or a vacation. Another element of this policy is that Pan American's contributions for medical and life insurance, which are normally covered by Pan American during periods of vacation and medical leave, are discontinued during a flight attendant's maternity leave.

5. Job policies and practices

Women shall not be penalized in their conditions of employment because they require time away from work on account of childbearing. When, under the employer's leave policy the female employee would qualify for leave, then childbearing must be considered by the employer to be a justification for leave of absence for female employees for a reasonable period of time. For example, if the female employee meets the equally applied minimum length of service requirements for leave time, she must be granted a reasonable leave on account of childbearing. The conditions applicable to her leave (other than the length thereof) and to her return to employment, shall be in accordance with the employer's leave policy.

If the employer has no leave policy, childbearing must be considered by the employer to be a justification for a leave of absence for a female employee for a reasonable period of time. Following childbirth, and upon signifying her intent to return within a reasonable time, such female employee shall be reinstated to her original job or to a position of like

FAA initiated a compliance review of Pan American's facility at John F. Kennedy Airport in Jamaica, New York, in October, 1976, pursuant to 41 C.F.R. § 60–1.20. During the next several months, Pan American and FAA discussed asserted deficiencies in Pan American's Affirmative Action Programs ("AAP") for 1976 and 1977. Several problems which had been raised by FAA were satisfactorily resolved.

However, FAA determined that Pan American's mandatory maternity leave policy[4] violates 41 C.F.R. Part 60–20[5] in that it imposes a penalty for childbearing. As a result, Pan American was found to be "nonresponsible" under 41 C.F.R. § 60–2.2(b)[6]

status and pay, without loss of service credits.
41 C.F.R. § 60–20.3(g)(1) and (2) (1976).

6. Agency action.

(b) If, in determining such contractor's responsibility for an award of a contract, it comes to the contracting officer's attention through sources within his agency or through the Office of Federal Contract Compliance Programs or other Government agencies, that the contractor has no affirmative action program at each of his establishments, or has substantially deviated from an approved affirmative action program, or has failed to develop or implement an affirmative action program which complies with the regulations in this chapter, the contracting officer shall declare the contractor/bidder nonresponsible and so notify the contractor, the Director, and the compliance agency unless he can otherwise affirmatively determine that the contractor is able to comply with his equal employment obligations. Any contractor/bidder which has been declared nonresponsible in accordance with the provisions of this section may request the Director to determine that the responsibility of the contractor/bidder raises substantial issues of law or fact to the extent that a hearing is required. Such request shall set forth the basis upon which the contractor/bidder seeks such a determination. If the Director, in his/her sole discretion, determines that substantial issues of law or fact exist, an administrative or judicial proceeding may be commenced in accordance with the regulations contained in § 60–1.26; or the Director may require the compliance agency to develop the investigation or compliance review further or to conduct additional conciliation: *Provided,* That during any pre-award conferences, every effort shall be made through the processes of conciliation, mediation and per-

and so subject to "passover" on two government contracts.

Meetings and correspondence on the issue of Pan American's maternity leave policy continued through the spring and summer of 1977. Pan American contended that there was a substantial issue of law or fact as to whether its maternity leave policy violates 41 C.F.R. Part 60–20 and FAA and OFCCP maintained that there was no substantial issue on this point.[7]

Pan American was named as the contractor on various government contracts after the finding of "nonresponsibility" was made, but was "passed over" with respect to the Cape Canaveral and MAC contracts.

On September 7, 1977, Pan American filed the complaint in this action and applied for a temporary restraining order and preliminary and permanent injunction seeking to prohibit the government from predicating a denial of future government contracts to Pan American upon its alleged discrimination in violation of the Order until there has been final agency action after notice and hearing.

On September 19, 1977, attorneys for the government advised me that the Department of Labor had permitted the Air Force to enter into the Cape Canaveral contract with Pan American, under the authority given to the Secretary in 42 U.S.C. § 2000e–17. Thus to the extent that the request for a preliminary injunction has been predicated upon "passover" with respect to the Cape Canaveral contract, it has been mooted. The government attorneys further advised me that the Air Force has unilaterally extended the expiring MAC contract with

Pan American for 90 days. The government contends that this extension completely moots the plaintiff's application: the plaintiff presses its application.

A. *Jurisdiction.*

The initial determination is one of jurisdiction. Plaintiff brings this action pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, et seq., the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Executive Order 11246, and asserts the jurisdiction of this court under 28 U.S.C. §§ 2151, 1331, 1343(4), 1346(a)(2), 1355, and 1361. Since I find that there is jurisdiction under 28 U.S.C. § 1331(a), I shall not discuss the other bases for jurisdiction claimed by plaintiff.

Jurisdiction under § 1331(a) lies in an action against a federal agency or any officer thereof acting in his official capacity whenever the matter in controversy "arises under the Constitution, [or] laws . . . of the United States."

In *Stevens v. Carey*, 483 F.2d 188, 190 (7th Cir. 1973), the Court of Appeals reasoned that Executive Orders to which § 1331(a) jurisdiction properly pertains are those which "were issued pursuant to statutory authority providing for presidential implementation and thereby have the force and effect of law." The Order has been held to fit that mold:

> This particular executive order [11246] and its direct antecedents have consistently been held to be based on statutory authority resting with the President to provide for procurement, utilization, and management of government property.

suasion to develop an acceptable affirmative action program meeting the standards and guidelines set forth in §§ 60–2.10 through 60–2.32 so that in the performance of his contract, the contractor is able to meet his equal employment obligations in accordance with the equal opportunity clause and applicable rules, regulations, and orders: *Provided further,* That when the contractor-bidder is declared nonresponsible more than once for inability to comply with the equal employment opportunity clause, the compliance agency shall promptly send to the Director a written request that enforcement proceed-

ings be initiated pursuant to § 60–1.26. Such request for initiation of enforcement proceedings shall be sent to the Director no later than the date of issuance of the second nonresponsibility determination.
41 C.F.R. § 60–2.2(b) (as amended 1977).

7. The significance of the issuance of a letter of substantial issues of law or fact is that upon its issuance "an administrative or judicial proceeding may be commenced . . . ., or the Director may require the compliance agency to develop the investigation or compliance review further or to conduct additional conciliation." 41 C.F.R. 60–2.2(b) (as amended 1977).

Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159, 166–171 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); Farkas v. Texas Instrument, Inc., 375 F.2d 629, 632 n.1 (5th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967)[7]. There is no question that Executive Order 11246 also has firm foundations in the fifth and fourteenth amendments to the Constitution and the several congressional enactments, including the comprehensive provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., intended to provide equal employment opportunities.

[7] Thus, in issuing Executive Order 11246 on September 24, 1965, President Johnson declared in a preface to the order that the order was issued "[u]nder and by virtue of the authority vested in me as President of the United States by the Constitution and statutes of the United States." Exec. Order No. 11,246, 3 C.F.R. 169, 170 (1974).

Legal Aid Society of Alameda County v. Brennan, 381 F.Supp. 125, 130 (N.D.Cal. 1974).

This action is brought against federal agency officials with respect to acts done in their official capacity in purporting to enforce the Order. I find that the matter in controversy arises under the laws of the United States within the meaning of § 1331(a).

B. Standards for Issuance of Preliminary Injunction

Sonesta Int'l. Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973), spells out the standards for issuance of a preliminary injunction in the Second Circuit:

[A] preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

■ Recent explications of Sonesta by the Second Circuit indicate that irreparable harm is in all cases a prerequisite for preliminary injunctive relief. Probability of success on the part of the one seeking the relief is not an inviolate precondition but there must at the very least be a finding that there are substantial issues to be litigated. If probability of success on the part of the moving party is not indicated, then in addition to the showing of irreparable harm which that party must make, the party must also show that the balance of hardships will be borne by it if relief is not granted.

Thus, in Jacobson & Co., Inc. v. Armstrong Cork Co., 548 F.2d 438, 442–43 (2d Cir. 1977), it was noted that "probable success on the merits" was not required by the second branch of the Sonesta test:

[A] showing of probable success on the merits was required only where the movant has failed to show either a threat of irreparable harm or a balance of hardships in his favor. . . .

We therefore reaffirm that the second branch of the Sonesta test requires no more than a showing of "sufficiently serious questions going to the merits to make them a fair ground for litigation."

But the Second Circuit has recently reiterated that a finding of threat of irreparable injury is required under both branches of the Sonesta test:

[T]hough not evident on its face, the "language of the second prong of the Sonesta test does not eliminate the basic obligation of the plaintiff to make a clear showing of the threat of irreparable harm. That is a fundamental and traditional requirement of all preliminary injunctive relief . . . .. In sum, the balancing of hardships test of Sonesta necessarily includes the showing of irreparable harm."

State of New York v. Nuclear Reg. Com'n., 550 F.2d 745, 750 (2d Cir. 1977), quoting Triebwasser & Katz v. American Telephone & Telegraph Co., 535 F.2d 1356, 1359 (2d Cir. 1976).

In accordance with the strictures of the Court of Appeals, I shall examine plaintiff's

petition for 1) showing of probability of success on the merits, or at the minimum, serious questions on the merits establishing a fair basis for litigation; and 2) showing of irreparable harm, and if probability of success has not been shown, a balance of hardships tipping toward plaintiff.

## C. Success on the Merits or Serious Litigable Questions

In order for me to find that the first prong of the first *Sonesta* test has been satisfied, Pan American must establish that it will probably succeed in demonstrating that defendants' actions were in conflict with the Order, in violation of 5 U.S.C. § 706.[8] Alternatively, to satisfy the first prong of the second test, Pan American must establish that the question of whether or not defendants' actions were in conflict with the Order and thus in violation of 5

U.S.C. § 706 is "a fair ground for litigation."

■ Under 5 U.S.C. § 706(2)(A) and (D), the court is mandated to set aside agency action which is "not in accordance with law" or "without observance of procedure required by law." The Order was issued pursuant to constitutional and statutory authority, and it has the force and effect of law. *Legal Aid Society of Alameda County v. Brennan, supra,* 381 F.Supp. at 130. *See also, United States v. New Orleans Public Service, Inc.,* 553 F.2d 459, 465 (5th Cir. 1977) and cases cited therein. Section 208(b) of the Order prohibits making "[an] order for debarment of any contractor from further Government contracts under Section 209(a)(6) without affording the contractor an opportunity for a hearing." [9]

---

**8.** Scope of Review.

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> \*   \*   \*   \*   \*   \*
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> \*   \*   \*   \*   \*   \*
>
> (D) without observance of procedure required by law;
> 5 U.S.C. § 706 (1967).

**9.** Executive Order 11246

> Sec. 208. (a) The Secretary of Labor, or any agency, officer, or employee in the executive branch of the Government designated by rule, regulation, or order of the Secretary, may hold such hearings, public or private, as the Secretary may deem advisable for compliance, enforcement, or educational purposes.
> (b) The Secretary of Labor may hold, or cause to be held, hearings in accordance with Subsection (a) of this Section prior to imposing, ordering, or recommending the imposition of penalties and sanctions under this Order. No order for debarment of any contractor from further Government contracts under Section 209(a)(6) shall be made without affording the contractor an opportunity for a hearing.

> Sec. 209. (a)(6) Provide that any contracting agency shall refrain from entering into further contracts, or extensions or other modifications of existing contracts, with any noncomplying contractor, until such contractor has satisfied the Secretary of Labor that such contractor has established and will carry out personnel and employment policies in compliance with the provisions of this Order.
> *See also:* 41 C.F.R. § 60–1.26(a)(2) as amended (1977): "[N]o order for debarment from further contracts or subcontracts pursuant to section 209(a)(6) of the Order shall be made without affording the contractor an opportunity for a hearing, either administrative or judicial."
> A surface inconsistency in the Order appears because a hearing is required by the terms of the Order for a "debarment," which occurs when the agency orders that "any contracting agency refrain from entering into future contracts . . . with a noncomplying contractor," Section 209(a)(6), but a hearing is not mandated by the Order when a contract is cancelled or suspended under 209(a)(5) because of noncompliance. However, this logical inconsistency disappears upon consideration of established law under the Due Process Clause of the United States Constitution, which requires a hearing before the cancellation of an existing property interest. *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). And it is clear that "[C]ontractual rights against the government are property interests protected by the Fifth Amendment, . . *Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935); *Lynch v. United States,* 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) . . . ." *Larionoff v. United States,*

Pan American has been found to be "non-responsible," and thus subject to "passover" on two government contracts. Originally, it was to be "passed over" on the Cape Canaveral and MAC contracts: with the reinstatement of the Cape Canaveral contract the "passover" is to be implemented with respect to the MAC contract and another as yet undesignated contract.

The difference between a "debarment" and "passover" is significant in relation to the presence of procedural safeguards. While the Order (§ 208(b)) requires a hearing before "debarment," the practice under the regulations, upon a finding of nonresponsibility, permits "passovers" on two contracts without any prior hearing.[10]

Thus the central issue in this case is whether the "passover" prescribed for plaintiff is equivalent to a "debarment" and thus subject to the procedural safeguard of the opportunity for a prior hearing. The defendants say "No": that a "passover" after a finding of nonresponsibility under the regulations promulgated by the Secretary is different in nature and degree from a "debarment" under the Order. A "debar-

175 U.S.App.D.C. 32, 44, 533 F.2d 1167, 1179 (1976), *cert. granted sub nom United States v. Larionoff*, 429 U.S. 997, 97 S.Ct. 2150, 53 L.Ed. 48 (1976). Thus, when the Order was drafted, it was not necessary to explicitly require a hearing prior to cancellation of contract, because the Constitution provides that right. However, the Constitution does not require a hearing before action which deprives a contractor the award of a future contract. The Order itself fills that void with the provision in Section 208(b) and the referral therein to debarments in Section 209(a)(6).

**10.** In its Supplemental Memorandum of Law regarding the scope of the term "debarment" submitted September 20, 1977, at page 19, et seq., and in its letter of September 23, 1977, at page 6, et seq., the government argued that in any event Pan American was afforded sufficient due process and that a full judicial or administrative hearing is not required. The government relates the opportunity afforded Pan American to rebut charges of non-compliance and cites *RCA Global Communications Inc. v. FCC*, 559 F.2d 881 (2 Cir. 1977). However, the minimum requirements of due process are not in issue in this case. Upon a determination that a debarment is involved, *de jure* or *de facto*, the Order and regulations mandate a hearing before debarment. Executive Order 11246 § 208(b), and 41 C.F.R. § 60–1.26(a)(2).

ment," according to the defendants, bars a contractor from *any* future government contracts, while a contractor subjected to "passover" is denied only two future government contracts.

■ The Secretary's interpretation and implementation of the Order is entitled to "special deference" when one is interpreting and measuring the validity of a regulation, *United States v. New Orleans Public Service, Inc., supra*, 553 F.2d at 465. Regulations properly issued pursuant to an executive order should therefore have the force and effect of law. *Legal Aid Society of Alameda County v. Brennan, supra*, 381 F.Supp. at 130, citing *Vitarelli v. Seaton*, 359 U.S. 535, 539, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959) and *Service v. Dulles*, 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). However, such regulations have validity only to the extent that they remain within the scope of the executive order:

[T]he appropriate measure of the regulation's validity is whether it was within the scope of the Executive Order." *United States v. New Orleans Public Service, Inc., supra*, 553 F.2d at 465

While the Order speaks only of "an opportunity for a hearing", the implementing regulation requires "an opportunity for a hearing, *either administrative or judicial.*" (emphasis supplied). Administrative enforcement proceedings are conducted under the control and supervision of the Solicitor of Labor and under the Rules of Practice for Administrative Proceedings to Enforce Equal Opportunity Under Executive Order 11246 contained in Part 60–30 of 41 C.F.R. Chapter 60. 41 C.F.R. § 60–1.26(c) (as revised 1977), and regarding judicial enforcement proceedings, under 41 C.F.R. § 60–1.26(e)(1) (as revised 1977):

Whenever a matter has been referred to the Department of Justice for consideration of judicial proceedings pursuant to § 60–1.-26(a)(2) of these regulations, the Attorney General may bring a civil action in the appropriate district court of the United States requesting a temporary restraining order, preliminary or permanent injunction, and an order for such additional equitable relief, including back pay, deemed necessary or appropriate to ensure the full enjoyment of the rights secured by the Order, or any of the above.

Thus, once a "debarment" is found to exist, the process required is clear.

Thus we look to the Order for a definition of "debarment", and it is defined there only in terms of consequences. Section 208(b) characterizes the result of action taken under § 209(a)(6) as a "debarment" and prohibits such action without prior opportunity to be heard. The action thus prohibited is for a contracting agency to "refrain from entering into further contracts" with a "non-complying contractor." [11]

The defendants maintain that "the actions of the defendants [the "passover"] relate only to two contracts." Clearly, under 41 C.F.R. § 60–2.2(b), without a hearing no more than two government contracts may be denied Pan American on the basis of its mandatory maternity leave policy. Thus the only difference between a "debarment" as functionally defined in the Order and a "passover" under the regulations is the number of government contracts affected. However, the Order does not authorize denial of two, or any number, of contracts before a "debarment" is held to have occurred. To the contrary, the language "further contracts" of Section 209(a)(6) of the Order indicates that a "debarment" occurs when *any* contract is denied on the basis of non-compliance.

Pan American submitted evidence to the effect that since the finding of "nonresponsibility" Pan American has been awarded four relatively small government contracts.[12] Only thereafter were the Cape Canaveral and MAC contracts designated for "passover" treatment. The contracts with respect to which the "passover" was made effective were identified by some undisclosed intra-governmental process which is highly selective, but obviously designed to induce compliance by economic coercion. In Pan American's case, the two contracts initially "passed over" constituted over 80% of

the Pan American's government contract work, worth several hundred million dollars and vital to its economic vitality.

As noted, the government contends that the recent award of the Cape Canaveral contract to Pan American, despite its continued status as a "nonresponsible" contractor, substantially moots the application for preliminary injunction. I disagree. Pan American has been denied the MAC contract without a hearing. Further, although the "passover" on the Cape Canaveral contract has been retracted by the government, under the regulations Pan American may be "passed over" for another contract at any time in the future, without hearing. Instead of obviating the deficiency of the regulation permitting the "passover" practice, this development highlights the susceptibility of the regulation to whim and caprice.

The court is familiar with Judge Metzner's decision that a finding of "nonresponsibility" does not constitute a de facto "debarment" because "[a] debarment is a total bar to receipt of a contract for a period of time . . . and the effect of a finding of nonresponsibility does not extend beyond the contract with respect to which the nonresponsibility was found." *Commercial Envelope Manufacturing Co. v. Dunlop,* 10 E.P.D. ¶ 10,252 (S.D.N.Y.1975) (No. 75–1573). However, the facts before me reflect no such limitation of the effect of the finding of "nonresponsibility".

The finding of "nonresponsibility" as to Pan American was predicated upon its mandatory maternity leave policy for pregnant flight attendants: its effect originally was had with respect to the Cape Canaveral [13] and the MAC contracts and the finding still provides a bar with respect to the MAC

---

11. A finding of "nonresponsibility" under the regulations is equivalent to and depends upon a finding of "non-compliance." 41 C.F.R. § 60–2.2(b) (as amended 1977).

12. These contracts are 1) the Occupational Medicine and Environmental Health Services Contract, NASA, Kennedy Space Center, Florida; 2) Plant Maintenance and Operations Support contract, Johnson Space Center, Houston,

Texas; 3) Engineering Support Services contract, Johnson Space Center, Houston, Texas; 4) Trident Submarine Base Support Services contract, U.S. Navy, Bangor, Washington.

13. The Pan American facility at Cape Canaveral was reviewed and found to be in compliance with the Order and regulations. Record of Hearing September 12, 1977 at 15.

contract. This broad application of the effect of a finding of "nonresponsibility" is authorized by the regulations (41 C.F.R. § 60–2.2(b)):

If, in determining such contractor's responsibility for an award of a contract, it comes to the contracting officer's attention . . . [that the contractor has no affirmative action program or has one which does not comply with the regulations] at *each* of his establishments, . . the contracting officer shall declare the contractor/bidder nonresponsible . .." (emphasis supplied).

Thus, pursuant to 41 C.F.R. § 60–2.2(b) and the "passover" practice based upon that section, a finding of "nonresponsibility" on one contract or at one facility of a given contractor is grounds for denial without hearing of two future unrelated contracts involving any facility of that contractor.

In a decision subsequent to *Commercial Envelope,* the Court of Appeals remanded a case brought against the Postal Service to the District Court for a finding of whether a "debarment" or less had occurred, recognizing that the nature of an agency action is not determined by the label that the agency employs:

The fact that the Service did not label its action as a "debarment" is inconsequential, for the Service cannot bypass these important safeguards merely by omitting the formal label to the sanction applied.

*Myers & Myers Inc. v. U. S. Postal Service,* 527 F.2d 1252, 1259 (2d Cir. 1975).

■ I have looked to the only definition of "debarment" in the Order—the functional one contained in Sections 208(b) and 209(a)(6)—and find that a "debarment" occurs when an agency is ordered to refrain from entering into future contracts with a contractor. No minimum number of affected contracts is required. The denial of the MAC contract to Pan American without provision of the opportunity for hearing required by the Order constitutes an action by the agency "without observance of pro-

cedures required by" the Order. 5 U.S.C. § 706(D).

*Horne Brothers, Inc. v. Laird,* 150 U.S. App.D.C. 177, 463 F.2d 1268 (1972), relied on by the government, is distinguishable on its facts. In *Horne,* the district court had granted an injunction based on plaintiff's allegations that the government had acted in violation of law by refusing to award the contractor a contract. The regulations permitted such action upon a finding by the Secretary of Defense of unlawful activities. The Court of Appeals reversed: it held that the action by the Secretary was not improper; it regarded a one month suspension as providing the government a reasonable time, after notifying the contractor of the suspension, before it must conduct a proceeding. The government here denies Pan American a hearing absolutely, not merely for a period of time, in the face of a requirement in the Order which requires a hearing before debarment.

■ Thus, I find that plaintiff has shown the requisite probability of success on the merits for its claim that it has suffered a *de facto* "debarment" and that it is entitled to a declaratory judgment that the agency has not complied with the Order. At the very least, plaintiff has established the presence of "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Sonesta Int'l. Hotels Corp. v. Wellington Associates, supra.*

### D. Irreparable Injury

The other requirement for the issuance of a preliminary injunction, necessary under both branches of the *Sonesta* test, is the threat of irreparable injury to the plaintiff in the absence of such relief.

Plaintiff's initial claims of damages due to delay in the signing of the Cape Canaveral contract are now moot. However, I find that Pan American will suffer from irreparable injury because of the "passover" on the MAC contract.[14]

14. Plaintiff also asserts that it suffers irreparable injury as a result of its *status* as a "nonresponsible" contractor. Specifically, plaintiff

alleges that other government contractors are reluctant to subcontract to Pan American because of this status, that government agencies

That contract was due to commence October 1, 1977, and remains unsigned. Defendant alleges that Pan American is suffering little or no injury from the unsigned status of the MAC contract, because the Government has unilaterally extended the current MAC contract with Pan American for 90 days, through December 1977. But Pan American requires a 60 or 90 day "lead time" to plan for airplane allocation to MAC and consequent airplane unavailability for commercial charter flights or other uses. It has already allocated certain airplane resources for MAC use in January, 1977 and is in the process of planning for February and March. Resources which are allocated for MAC use will be idle, at a cost of approximately one million dollars per month for the first three months of 1978, if Pan American does not receive the MAC contract for 1978, because of inability to resell, on short notice, space already committed to MAC.[15] Of course, Pan American is under no obligation to reserve any space for MAC beyond the terms of the present contract as extended, which expires at the end of this calendar year. Pan American does so in reliance on the preliminary award of the MAC contract to Pan American, pending approval by FAA, which approval has been denied upon a basis which is in issue here.

In addition to the "lead time" planning problem and potential monetary losses stemming therefrom, Pan American is in apparent danger of losing the MAC contract for 1978, because during the 90-day extension of the current contract, the government is seeking alternative sources for 1978, as indicated by a telegram sent to Pan American by the Government notifying Pan American of the 90-day extension:

> This three months extension is made to allow continued orderly air transportation services for Department of Defense personnel and their dependents while the Air Force identifies an acceptable source which meets our needs and which complies with Executive Order requirements.[16]

■ Pan American has no adequate remedy at law. "It is settled that in cases of this kind [an action by a contractor seeking damages arising out of the awarding of a contract to a competitor] this court will not award recovery of lost profits. The damages cannot exceed bid preparation costs. . . ." *Excavation Construction, Inc. v. United States,* 494 F.2d 1289, 1290 (Ct.Cl. 1974). Therefore, the irretrievable monetary loss is properly considered in determining irreparable injury.

Pan American may also suffer irreparable injury from loss of subcontracts due to its "debarment." Under 41 C.F.R. § 60-1.4(b)(7) (1976), an applicant for a grant, contract, loan, insurance, or guarantee involving federally assisted construction which is not exempt from the requirements of the equal opportunity clause must undertake that "the applicant will not contract with a contractor debarred from, or who has not demonstrated eligibility for Government contracts . . . ".[17]

---

may be disregarding Pan American in their perusal of potential contractors, and that Pan American's general business reputation and public image are tarnished by this status. It is possible that Pan American's apprehensions are justified. However, they are not relevant to the preliminary relief sought herein. Pan American is seeking a preliminary injunction based upon the government's alleged violation of the Order in its denial of a hearing before "de facto" "debarment." The Order does require a hearing before "debarment" and I have found that a "debarment" has in fact occurred. Nonetheless, the Order does not require a hearing before a finding of non-compliance, or even before publication of names of those found to be in non-compliance. Executive Order 11246, Sections 208(b) and 209(a)(i).

15. Affidavit of James T. Rice, Staff Vice President, Pan American, dated September 20, 1977.

16. *Id.,* at pp. 3-4 and Attachment "A" thereto.

17. It should be noted that a finding of ineligibility is the same as a "debarment" action; the terms are interchangeable. The authority, procedures and consequences are the same, i. e., Exec. Order Section 209. *See* 41 C.F.R. § 60-1.26(b)(2)(ii) (1976). In the 1977 revisions to the regulations, ineligibility is not mentioned; debarment is the appropriate term used. 41 C.F.R. § 60-1.26(a)(2) (as revised 1977).

Thus plaintiff will suffer irreparable injury in the absence of preliminary relief. I now balance the hardships which the government allegedly will incur if the preliminary injunction is granted, considering also the public interest involved.[18]

The government correctly asserts that it has the right to choose with whom it makes contracts. *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 127, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). However, Pan American has already been chosen for this contract; the only obstacle is the "passover" which Pan American alleges is in violation of the Order. The government is not being denied its prerogative of choosing contractors; it is merely being instructed to exercise that prerogative in accordance with the Order, which is the relevant law. While no contractor has a right to a government contract, I find that Pan American would have been awarded the MAC contract except for the finding of "nonresponsibility" and the invocation of "passover" with respect to the MAC contract.

The government asserts that *it* will suffer irreparable harm as a result of the granting of the preliminary injunction because every contractor, however small, who is denied a contract on the basis of noncompliance with the anti-discrimination mandates of the Order will assert a right to prior hearing. I do not minimize the burden this places upon the government. However, this burden is not unilaterally imposed by the court; it is imposed by the Order. Additionally, this disposition is on an application for a preliminary injunction and initially this burden is mandated only until a decision after a full trial. Thus, the contention by the Government of irreparable injury is not persuasive.

Finally, I must consider to what extent the public interest is deterred or advanced by the granting of the relief sought by plaintiff.

[W]here the grant of interim relief may adversely affect the public interest in a manner which cannot be compensated for by an injunction bond, plaintiffs undertake an even greater burden of persuasion. See *Yakus v. United States,* 321 U.S. 414, 440–41, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *New York Pathological and X-Ray Laboratories, Inc. v. INS,* 523 F.2d 79, 81 (2d Cir. 1975). Certainly it is not too much to ask that plaintiffs who seek such interim relief establish a probability of success on the merits.

*The Medical Society of the State of New York v. Toia,* 560 F.2d 535 at 538 (2 Cir. 1977) (other citations omitted). I have discussed the probability of success on the merits and have found that plaintiff has established the requisite probability.

Where lies the public interest? In litigation involving the administration of regulatory statutes designed to promote the public interest, this factor necessarily becomes crucial . . . We must determine . . . how the court's action serves the public best.

*Virginia Petroleum Job. Ass'n. v. Federal Power Com'n.,* 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958).

The public interest advanced by the action of defendants is assurance that government contractors do not discriminate on the basis of sex. This interest is a vital one. However, if the government ultimately prevails, the contract with Pan American, if one is signed in the interim, could be cancelled and back pay and other benefits could be awarded to the flight attendants affected in the intervening period.[19]

There is another public interest aspect to this matter. The agency's action is in conflict with the Order's mandate for a hearing before "debarment." Through this action,

---

18. As stated above, a balancing of hardships is required in addition to a finding of irreparable injury to plaintiff, where plaintiff has established sufficiently serious questions to make them fair grounds for litigation but has not clearly established probability of success on the merits. Because I have found that plaintiff has

established probability of success *or at least* sufficiently serious questions, I will also balance the hardships to the parties involved.

19. Plaintiff has agreed to "track" the flight attendants affected during the period of the preliminary injunction.

plaintiff represents the public interest in assuring that government agencies comply with the laws (or executive orders) under which they operate.

The burden on the government by the issuance of this injunction is, on balance, slight, and the public interest in government compliance with the laws governing its action (here the Order, § 208(b)) also favors preliminary relief for plaintiff.

Therefore, pending a trial on the merits, defendants are enjoined from "passing over" plaintiff upon the finding of "nonresponsibility" without first affording defendants the opportunity for a hearing pursuant to Section 208(b) of the Order.