ART–METAL—USA, INC., Plaintiff,

v.

Joel W. SOLOMON, Administrator, General Services Administration, and General Services Administration, Defendants.

Civ. A. No. 78–1660.

United States District Court, District of Columbia.

Oct. 6, 1978.

Herbert L. Fenster, Kenneth W. Weinstein, Washington, D. C., for plaintiff.

Mary Elizabeth Medaglia, Asst. U. S. Atty., Washington, D. C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

Art Metal is the government's largest supplier of metal office furniture. It com-

petes for government contracts by submitting bids as solicited by GSA under advertised competitive procurements which are awarded to the lowest priced responsible bidder. During the past few months, in the ordinary course of the government's procurement process, bids for a variety of metal furniture items have been solicited from Art Metal and others.

Several months ago, Art Metal began to achieve some notoriety when a series of local newspaper articles describing the government's broad-scale investigation into GSA operations[1] began to focus on that agency's relationship with Art Metal. By the end of August, stories had appeared in both the *Washington Post* and the *Washington Star* concerning Art Metal's alleged failure to meet GSA specifications, inferior products, and possible abuses in contract dealings with GSA.[2]

On August 24, 1978, in the normal course of procurement operations, Art Metal received a formal notice of award of the government's October, 1978—September, 1979 vertical file cabinet requirements contract worth approximately $9.4 million. Art Metal is the holder of the present file cabinet contract and was the lowest bidder by $5 million on next year's contract. That same day, however, a telegram was sent to Art Metal terminating the contract in its entirety, with no explanation other than "for the convenience of the government." Since then, the awards on four additional GSA contracts for which Art Metal had bid have been, and are being, held in abeyance beyond the time when they would have been made in the normal course of business.

On September 5, 1978, Art Metal filed this complaint alleging that the termination of the file cabinet contract implemented an unlawful debarment of it by GSA, without prior notice or hearing, in violation of the Constitution, the Administrative Procedure Act, and GSA's own regulations.[3] The complaint requested a declaratory judgment as to the unlawful debarment, and preliminary and permanent injunctions enjoining defendants from taking any act in furtherance of the debarment from this contract, and ordering them to rescind all agency action taken to effectuate that debarment.

After hearing the arguments of counsel for both sides, the Court denied issuance of a temporary restraining order on September 6, 1978, and granted Art Metal leave to engage in discovery to enable the Court to ascertain whether the facts supported a finding of debarment as distinguished from a simple contract termination. The case is now before the Court on Art Metal's motion for preliminary injunction.

## I

In determining whether Art Metal is entitled to a preliminary injunction, the relevant factors are: (1) whether plaintiff has demonstrated that it will suffer irreparable injury absent such relief, (2) whether there is a substantial likelihood that it will prevail on the merits, (3) whether the issuance of an injunction would substantially harm other parties interested in the proceedings, and (4) wherein lies the public interest. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 182 U.S.App.

---

1. A major campaign to clean up the GSA was launched by the agency in May, 1978; a Special Counsel to the GSA Administrator was appointed to oversee and coordinate the inquiry; and two Senate subcommittees began to examine the practices of the agency. Since that time, there has been substantial press coverage of the alleged abuses, improprieties, and "scandals" in and about GSA. Copies of the articles were attached to an affidavit submitted in support of plaintiff's application for a temporary restraining order.

2. Art Metal claims that it has never been accused by the government of any impropriety,

nor charged with any criminal or fraudulent act in connection with its government business, and that it has delivered approximately 55,000 file cabinets under its present contract to the government, without receiving a single complaint from GSA.

3. Art Metal also alleged that certain information it gave to GSA contained trade secrets and other confidential commercial information, and that its disclosure by GSA to the press was without due process, and violated various statutes as well as GSA's own regulations. The issues concerning these allegations are not before the Court at this time.

D.C. 220, 559 F.2d 841, 843 (1977); *Virginia Petroleum Jobbers Association v. F. P. C.,* 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958). These factors are discussed below.

## II

■ The question of irreparable injury to Art Metal may be disposed of rather summarily. Art Metal has produced credible evidence that the vast majority of its business for more than twenty years has been to supply office furniture to the GSA; that the file cabinet contract which was terminated on August 24 represents approximately one-third of its total government sales; that its present file cabinet contract expired on September 30, 1978, and most of its remaining GSA contracts shortly thereafter; and that absent an injunction, it will be put out of business.[4] Defendants do not attempt to rebut this evidence but challenge its sufficiency on the grounds that the government is not under an obligation to award to Art Metal, or anyone else, any contract at all, and that there is no evidence that Art Metal could not find another market for its products.

These contentions are not well taken. As noted below, it is well settled that while no individual or corporation has a right to be awarded a specific government contract, one who has been dealing with the government on an ongoing basis may not be blacklisted from further contracting except for valid reasons and in conformity with the

procedural safeguards established by law. Moreover, the Court would have to be blind to the realities to conclude that Art Metal would be able to shift its long-established commercial patterns to private purchasers on essentially a "moment's notice." The Court therefore finds that Art Metal has made the requisite showing of irreparable injury.

## III

■ With respect to Art Metal's likelihood of success on the merits, it is clear at the outset that due process of law requires that before a contractor may be blacklisted (whether by debarment or suspension) he must be afforded specific procedural safeguards, including, *inter alia,* a notice of the charges against it, an opportunity to rebut those charges and, under most circumstances, a hearing. *Gonzalez v. Freeman,* 118 U.S.App.D.C. 180, 334 F.2d 570 (1964); *Horne Brothers, Inc. v. Laird,* 150 U.S.App. D.C. 177, 463 F.2d 1268 (1972); *Myers & Myers, Inc. v. U. S. Postal Service,* 527 F.2d 1252 (2d Cir. 1975); *Pan American World Airways, Inc. v. Marshall,* 439 F.Supp. 487 (S.D.N.Y.1977). GSA's own regulations (41 C.F.R. §§ 1–1.600 et seq.) embody these same principles. Inasmuch as defendants readily concede that Art Metal has been afforded none of these basic protections, plaintiff's chance of succeeding on the merits is extremely high if it has in fact been debarred or suspended.[5]

---

**4.** The destruction of a business is irreparable harm sufficient to warrant the granting of interim relief. *Washington Metropolitan Area Transit Commission v. Holiday Tours, supra,* 182 U.S.App.D.C. at 220, 559 F.2d at 841. Art Metal has no adequate remedy at law inasmuch as the damages it could obtain would be limited to its bid preparation costs. Thus, the irretrievable monetary loss is properly considered in determining irreparable injury. *Pan American World Airways v. Marshall, infra,* 439 F.Supp. at 497.

**5.** Defendants also argue at some length that the Court lacks jurisdiction over this action, claiming that sovereign immunity bars an action for specific performance, that the Tucker Act (28 U.S.C. §§ 1346(a), 1491) provides the Court of

Claims with exclusive jurisdiction over contract disputes with the government, and that the Administrative Procedure Act specifically exempts from judicial review agency action for which there is some other adequate remedy elsewhere (*e. g.,* in the Court of Claims). Whatever may be the validity of these contentions in the context of a suit which seeks the award or recission of a particular government contract, they are not relevant to an action to enjoin an unlawful debarment from government contracting generally. The decisions cited above have settled that with respect to such unlawful actions the Court has jurisdiction. See also *Quality Maintenance Co., Inc. v. Brennan,* No. 74CV148–W–2 (W.D.Mo. April 23, 1974).

On the basis of the evidence[6] in the record, there can be no doubt but that GSA did debar or suspend Art Metal for an indefinite period. Art Metal's file cabinet contract was summarily cancelled on August 24, 1978, under conditions relating not only to that particular contract, but to Art Metal's overall status as a GSA contractor. Since that time, Art Metal's bids on four additional contracts—on three of which it is the lowest bidder—have been held in "what is probably described as either status quo or suspended animation [for] a point in time [which] has not been set" (Deposition of Federal Supply Services Commissioner Robert Graham, p. 45).

GSA's managers candidly state in their depositions that they have no intention of awarding these or other contracts[7] to Art Metal as long as that company "is being investigated"—a process they concede could continue for an unspecified period of time.[8]

Defendants' claims that none of this amounts to a debarment, and that other valid explanations exist for their actions, are not persuasive. One explanation offered is that GSA suspended only "contracts" and not "contractors" (*i. e.*, Art Metal). While this construction would no doubt escape the consequences of GSA's own suspension regulations, it is clear from the record that the suspensions here were not the product of a general contract review program, but rather a decision to hold up those contracts on which Art Metal is a bidder.[9] For purposes of the regulations, the suspension of these contracts is tantamount to the suspension of the company.[10]

Another explanation offered is that GSA's entire procurement process is being revised, and that the regulations concerning the delegation of authority (to review and approve contracts) were in the midst of revision on August 24 when Art Metal received the file cabinet contract. Thus, it is claimed, it was only through the error of a subordinate that Art Metal was given the contract at all.[11] Not only is this inherently

6. Defendants' argument that there is no such thing as a *de facto* debarment is mistaken. These procedures are required regardless of the label placed on the agency action. See *Gonzalez v. Freeman, supra; Myers & Myers, Inc. v. U. S. Postal Service, supra*, 527 F.2d at 1259.

7. Art Metal claims that GSA has not only terminated the file cabinet contract and suspended all further contracts but has ceased doing business with Art Metal. In this regard, it notes that it received no purchase orders on existing contracts between August 24, the date the file cabinet contract was terminated, and September 26, the day before the hearing on the instant motion for preliminary injunction (despite a GSA claim that purchase orders had been withheld for only six days in September). Art Metal also points to GSA's denial on August 23, of a claim for some $809,000 which GSA's own auditors had earlier found to be substantiated and payable. Whatever bearing these contentions may have on the claim that GSA has *severed relations with Art Metal completely*, they do not significantly alter the resolution of the central issue in this case—that of Art Metal's debarment from receiving new GSA contracts.

8. Assistant Commissioner Ciro Farina, designated by Commissioner Graham as the officer to whom all pending Art Metal contracts must be referred, stated that he has not at all looked at the Art Metal contract files which had been forwarded to him over four weeks ago, and does not intend to do so until "another matter under deliberation bearing on Art Metal's responsibility" is determined first. He has not determined how long that process will take. GSA Administrator Jay Solomon stated that in his opinion, GSA will continue to withhold contracts from Art Metal for "a couple of months" but "it could be" longer (Solomon deposition, pp. 14–15) and Mr. Graham states that "a point in time has not been set" (Graham deposition, p. 37).

9. According to defendants, the only other contracts which may have been held up are those which others under investigation by GSA have submitted bids.

10. It is legally irrelevant that the contracts have not been awarded to *anyone*. Art Metal is entitled not to the award of a specific contract, but rather not to be debarred without due process from government contracting at all. See *Sundstrand Corp. v. Marshall*, No. 28 C 20027 (N.D.Ill. April 20, 1978); *Horne Brothers, Inc. v. Laird, supra; Gonzalez v. Freeman, supra; Pan American World Airways v. Marshall, supra.*

11. While these limitations on the delegation of authority have been in effect since September 8, 1978, this was not true on August 24–25. The existence of proposals, drafts, or confusion within the agency cannot serve as a basis for

incredible in the context of this case and the deposition testimony of GSA's own officials, but it does not explain the continued blacklisting of Art Metal from receiving new contracts.

■ The final explanation offered by defendants is that the file cabinet contract was terminated "for the convenience of the government", and that GSA is presently looking into the "responsibility" of Art Metal. However, neither the Court nor Art Metal has been able to secure any factual elucidation as to what, if anything, Art Metal is supposed to have done, beyond a cryptic statement by counsel for the government at argument that "someone" in GSA knows the answer. Actually, it became apparent from the deposition testimony of GSA's top officials that the decision to terminate the file cabinet contract "for convenience of the government" was the result of their conclusion that no valid grounds for debarment could be found.[12] In these circumstances, absent a factual basis in the record, the Court will not allow the government to hide behind the cloak of conclusory terms such as "convenience" and "responsibility" to justify its actions.[13]

■ Defendants alternatively argue that, at a minimum, it is not unlawful to hold up contract awards during the pendency of an investigation into wrongdoing. While this issue is not free from doubt, the Court is willing to assume that, although the regulations do not so provide, it may be lawful in exceptional circumstances to suspend a contractor temporarily pending an investigation. However, both case law and common sense dictate that the exception is a narrow one, and that a departure from the regulatory requirements may be countenanced only in extreme situations such as those involving national security, and then only for a limited time. See *Horne Brothers, Inc. v. Laird, supra.*[14] That is not this situation.

■ While defendants have strived to envelop this case with a miasma of corruption, discussing that subject at length in their brief in vivid terms, the record before the Court suggests that their actions with respect to Art Metal were based on a different set of reasons. The first high-level discussions of Art Metal with Jay Solomon, Administrator of GSA, appear to have taken place when Robert Graham, Commissioner of the Federal Supply Service, informed him of the August 24 award of the file cabinet contract. Mr. Solomon's reaction was "how in God's world could there be an award to Art Metal in view of the fact that there is so much going on in the papers?" and with "us getting ready to go to the Senate oversight hearings" (Graham deposition, p. 23; Solomon deposition, p. 40). His confidential assistant, Paige Reffe, agreed that "in light of the recent publicity" such an award to Art Metal "wouldn't look very good" (Reffe deposition, pp. 14–15). Perhaps the deposition testimony of William Richardson, Director of the Furniture Center, best describes the atmosphere in the upper level GSA echelons at that time (Richardson deposition, pp. 39–40):

invalidating actions properly taken with respect to a third party under the regulations effective at the time.

12. At meetings held on August 24 and 25, various alternative tacts were discussed, including informing the company that it was debarred or that it would not receive contracts because an investigation was in progress. After Special Legal Counsel Alto warned the GSA officials that there may not be "adequate legal grounds for suspension or debarment", it was agreed instead simply to terminate under the "convenience" clause.

13. Indeed, insofar as Art Metal's "responsibility" is concerned, it has been found to be a "responsible" bidder by GSA's own evaluations on every one of the advertised contracts award-

ed to it over the past two decades, and as recently as June, 1977, it was placed under GSA's Quality Assurance Manufacturing Program, which is reserved for manufacturers with established records of quality performance. Moreover, it appears that with respect to the five contracts at issue here, Art Metal was determined to be at least financially responsible, capable of producing the items, and reasonably priced.

14. Even in these situations, the *Horne* Court stated that a formal determination that significant injury would result by having a hearing would be required before a suspension could be maintained beyond a 30-day period.

Q: What occurred at this meeting?

A: It commenced with the Administrator asking who was responsible for making the award to Art Metal.

Q: Who volunteered?

A: Me.

Q: You volunteered?

A: I raised my hand.

Q: Did anybody else volunteer.

A: No.

Q: And what was the Administrator's reaction to your having indicated that you were responsible?

A: He asked me why I did it.

Q: What was your answer?

A: My answer was that I didn't know of any reason why I should not.

Q: What was the Administrator's reaction to that?

A: He said, "Don't you read the newspapers?"

Q: Had you read the newspapers?

A: Yes.

* * * * * *

Q: To your knowledge, and in light of your experience and your position, did the appearance of those articles indicate any reason why you shouldn't have permitted the award of the file cabinet contract?

A: We had nothing in our files to substantiate the articles written by Mr. Kessler.

Thus, not only was the primary concern "public relations" (Solomon deposition, pp. 39–40), but the lack of substantiating evidence was well known. As a matter of fact, Messrs. Solomon, Graham, and Alto all said so when asked whether GSA had anything to corroborate the press reports.[15]

Defendant's excuses for noncompliance with their own regulations are not only substantively weak, they are untimely as

well. Newspaper articles concerning Art Metal began to appear as early as July 3, 1978, in the *Washington Post*, and Mr. Graham promptly expressed concern about awarding contracts to Art Metal in view of the publicity. An investigation may have been in progress ever since June, but after almost four months GSA has yet to develop sufficient evidence to so much as inform Art Metal of its alleged wrongdoing.[16] Finally, not only has the investigation not been completed, but nobody is able to give even a rough approximation as to when it might be.

Accordingly, the Court finds that defendants have blacklisted this plaintiff in violation of the law and their own regulations, and that plaintiff's likelihood of prevailing on the merits is high.

### III

The final factor[17] the Court must consider is the public interest. In that respect, defendants vigorously argue that the equities are on their side. They stress that, at the behest of the President, GSA's Administrator has embarked on the Herculean mission of eliminating fraud, corruption, and dishonesty in and about the General Services Administration. Such an effort is surely in the public interest, and the Administrator is to be highly commended for undertaking it. Corrupt practices in the government's principal purchasing agency should be eradicated, not only because they are intrinsically wrong and indeed criminal, but also because they are likely to feed a sense of citizen disillusionment with government itself. However, generalized corruption in GSA is not the issue before this Court. This case concerns GSA's conduct with respect to a specific plaintiff, and the agency's decisions therefore must have a basis in this plaintiff's acts or omissions.

15. When Mr. Solomon was asked on September 20, 1978 whether he had "any reason to know at this time" whether the allegations against Art Metal were true, his answer was a simple "No, I don't" (Solomon deposition, pp. 18–20).

16. Administrator Solomon himself became aware of this state of affairs no later than

August 24, 1978. Thus, at a minimum, the thirty-day period allowed in *Horne Brothers, Inc. v. Laird, supra,* has elapsed.

17. The factor of whether issuance of a preliminary injunction would substantially harm other interested parties is appropriately treated as a public interest consideration.

As noted *supra*, GSA has adduced no evidence of fraud, corruption, or contractual deficiencies on the part of Art Metal, and as late as September 20, 1978, GSA's Administrator testified that he knew of no such evidence. The Court is unable to accept defendants' argument that, because of the crisis in GSA, one must subordinate the "trees" of particular individuals' rights and interests to the "forest" of GSA's need to deal with corruption (defendants' brief, p. 31). Such arguments have been made in many crisis situations and regularly rejected. See, *e. g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (seizure of steel mills); *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (revocation of security clearance); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) (discharge of foreign service officer on "loyalty" grounds); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866) (Civil War conviction of civilian by military tribunal).

The public interest is not served when the end of a more honest and efficient government is sought to be achieved through means other than those prescribed by law, nor is it served by official blacklisting based not on evidence but on the premise that to do otherwise "wouldn't look very good". Moreover, our system of laws does not operate on the principle of the Queen in *Alice in Wonderland*—"Sentence first—verdict afterwards."[18] It requires the evidence to come first.

This Court does not know whether in fact Art Metal has been involved in any improper activities, and apparently neither does GSA. If and when GSA has a basis for charges against Art Metal, it may by all means deny further contracts to that company, cancel existing contracts,[19] and take any other appropriate measures. But not until then.

## IV

For the reasons stated, the Court finds that defendants have debarred Art Metal from contracting with them effective August 24, 1978, without proceeding in the manner prescribed by the law and their own regulations. Accordingly, a preliminary injunction will issue to enjoin further unlawful acts of debarment against Art Metal and to restrain defendants from perpetuating its prior unlawful acts of debarment. Defendants will therefore be required to reinstate the contract award wrongfully terminated and to allow Art Metal to bid, receive, and maintain contracts in the same manner and under the same standards applicable to other contractors, unless and until debarment or suspension proceedings are properly initiated, or until further order of this Court. Defendant's motion to dismiss will be denied.

---

18. Compare *Horne brothers, Inc. v. Laird, supra*, 463 F.2d at 1271, where the Court said, "A question of judgment is involved, but we note that no contractor may be suspended under the regulations unless there is 'adequate evidence' of a dereliction . . . This is less than must be shown at trial, but it must be more than uncorroborated suspicion or accusation."

19. If defendants hereafter do suspend or debar Art Metal in accordance with the appropriate regulations, they may of course also terminate all unexecuted portions of their contracts with Art Metal at that time.