**ARROW AIR, INC., Plaintiff,**

v.

**UNITED STATES of America, Hon. Caspar W. Weinberger, Hon. Edward C. Aldridge, Defendants.**

**Civ. A. No. 86–2696.**

United States District Court,
District of Columbia.

Oct. 29, 1986.

David L. Vaughan, Edward M. Lebow, Washington, D.C., for plaintiff.

Stuart Newberger, Asst. U.S. Atty., Office of the U.S. Atty., Judiciary Center, Washington, D.C., for defendants.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Plaintiff Arrow Air, Inc. (Arrow), a charter air carrier which until recently had been doing business with the Department of Defense (DOD) on an ongoing basis, brought this action for declaratory and injunctive relief challenging a DOD determination that found Arrow "not capable" of performing certain airlift services for the Military Airlift Command (MAC)[1] for fiscal year 1987.[2] Named as defendants are the United States, the Secretary of Defense, and the Secretary of the Air Force. Jurisdiction is asserted to exist under 28 U.S.C. §§ 1331 and 1346. The case is presently before the Court on plaintiff's motion for a preliminary injunction. Having considered the motion, defendants' opposition thereto, the parties' legal memoranda, the arguments of counsel, and the record herein, the Court concludes that Arrow is not entitled to the extraordinary relief requested because it has failed to demonstrate (1) that it has a substantial likelihood of success on the merits and (2) that it will suffer irreparable injury absent such relief. The following constitutes the Court's findings of fact and conclusions of law required by Rule 52(a).[3]

## BACKGROUND

Arrow Air, Inc., a Delaware corporation with its principal place of business in Miami, Florida, is a charter air carrier of persons, property, and mail duly licensed by the Federal Aviation Administration (FAA). Arrow does business with both

1. MAC is a component of the United States Air Force.

2. All references to the fiscal year are to the federal fiscal year which commences annually on October 1 and terminates on September 30 of the following calendar year.

3. The facts as set forth herein are based upon the statements of fact appearing in the parties' memoranda and the exhibits filed in support thereof as no evidentiary hearing was considered necessary by the parties. The Court did, however, hear oral argument on the instant motion on October 16, 1986.

governmental and private purchasers of airlift services. Since 1981, it has been engaged in providing air transportation services on a contractual basis to various components of the DOD, including MAC. Through its MAC contracts, Arrow generated approximately $22 million in revenue during fiscal year 1986, a sum representing roughly twenty-five percent of its gross revenues for that period. Arrow's remaining revenues during fiscal 1986 were derived from non-government work. Arrow is presently in Chapter 11 reorganization proceedings under the bankruptcy laws.[4]

As noted earlier, MAC is a principal subdivision of the United States Air Force and is designated as the "Single Manager Operating Agency" for certain categories of DOD airlift requirements. In addition to exercising command and control over all military airlift resources worldwide, MAC is responsible for procuring any necessary contract airlift services for (1) DOD long-term (in excess of ninety days) airlifts within the continental United States, and (2) DOD international airlifts.

Arrow in recent years has participated in contracts issued by MAC under the Civil Reserve Air Fleet (CRAF) program. CRAF is a voluntary DOD program with private industry whereby civil air carriers may offer to dedicate both equipment and crews for use in contingency airlift operations during times of national crisis. Various "stages" of commitment are available under the CRAF program for eligible carriers. Participation is encouraged, *inter alia*, by apportioning fixed-price contracts for certain categories of DOD peacetime transportation requirements among the participating carriers in accordance with their capabilities and a pre-established methodology for measuring the quantum of their participation in the CRAF program. Solicitation of CRAF participation is non-competitive; contract rates are fixed in advance. In the years preceding the challenged determination of ineligibility, Ar-

row, as a participant in the CRAF program, was awarded contracts in the "long range international" service category.

On December 12, 1985, an Arrow flight, not chartered by MAC, was involved in a tragic accident. A DC–8 aircraft operated by Arrow crashed immediately following takeoff from Gander International Airport, Newfoundland. The plane carried 248 United States soldiers from the 101st Airborne Division and 8 crewmembers. The soldiers were returning home to their families following tours of duty in the Middle East as members of the Multinational Peacekeeping Force stationed in the Sinai Desert. All 256 persons on board were killed.

Although the Arrow flight which crashed at Gander had been chartered by the Multinational Peacekeeping Organization and not by MAC, an evaluation of Arrow operations and maintenance was conducted by MAC immediately following the accident. While the preliminary results did identify some problems, it was initially determined, based upon MAC's own evaluation and information provided to MAC by the FAA, that no sufficient basis existed for suspension of DOD flights with Arrow. Accordingly, MAC continued to do business as usual with Arrow until early February 1986.

During early February 1986, the House of Representatives, Committee on Armed Services, Subcommittee on Investigations, was conducting hearings on the Gander crash. The Subcommittee heard testimony critical of Arrow's operations including, for example, testimony that Arrow was not reporting safety violations and operating irregularities to the FAA as required and that Arrow crews were often pressured to fly under unsafe conditions. The hearings concluded on February 6, 1986, with the adoption of a resolution by the Subcommittee requesting the Secretary of Defense to suspend all contracts with Arrow Air pending completion of the Gander accident in-

---

**4.** The exact date on which Arrow filed for Chapter 11 protection is not disclosed in the record. Counsel for plaintiff, however, represented at

the hearing that the bankruptcy action was commenced "last winter".

vestigation. Also during the first week of February 1986,[5] the FAA, which was then conducting a special inspection of Arrow triggered by the Gander incident, disclosed to MAC, *inter alia,* that Arrow was improperly using foreign-sourced spare parts on its aircraft. On February 7, 1986, all MAC charter activity with Arrow Air,was temporarily suspended because of concerns regarding Arrow's safety and capability.

MAC resumed cargo-only airlift operations with Arrow on April 10, 1986, following resolution of the earlier concerns and correction of the deficiencies noticed prior to the suspension. The resumption of charter activity was accompanied by a bilateral modification of the MAC contract with Arrow which substituted cargo-only service for passenger service. MAC contract flights with Arrow continued on this basis until the expiration of the contract for fiscal year 1986 on September 30.

On June 5, 1986, Arrow submitted a proposal to MAC in response to a request for proposals (RFP) for "International Air Transportation Services for [the] Civil Reserve Air Fleet (CRAF)—Long Range International", solicitation number F 11626–86–R–0030. Attachment 1, plaintiff's motion for a preliminary injunction. The RFP contained the requirements for the award by MAC of contracts for international civil air transportation services for fiscal year 1987. Arrow's proposal under this RFP was for the award of the successor contract to the one awarded Arrow for fiscal year 1986.

Following submission of its proposal in response to the fiscal year 1987 RFP, Arrow's capability to perform airlift services was evaluated pursuant to a process set forth in MAC Regulation 70–1 (MACR 70–1).[6] Under this process, the Contract Airlift Capability Survey Committee (the Com-

mittee), a group of senior MAC officers whose membership and duties are fixed by MACR 70–1, is responsible for performing an evaluation of the capability of MAC contractors and for submitting a capability finding and recommendation to the Commander in Chief of MAC (CINCMAC), who has authority under MACR 70–1 to make final capability determinations.

On July 21 and 22, 1986, the Committee conducted an on-site inspection of Arrow. At a subsequent meeting on August 26, 1986, the Committee members voted unanimously to find Arrow "not capable". The Committee Report [7] indicated that the Committee's finding was based on consideration of a number of relevant factors instead of any single element, but that the most important factor bearing on capability was air safety. The Report further indicated that the Committee, in arriving at its conclusion, considered Arrow's (1) past performance, (2) financial condition, (3) accident experience and accident prevention program, and (4) FAA violations. With respect to Arrow's financial condition, the Report noted that Arrow had earlier filed a Chapter 11 bankruptcy action, but that the Committee did not consider that fact "in and of itself ... to be disqualifying." It was noted, however, that "Arrow continues to be under financial pressure due to, among other things, its loss of commercial revenues in the wake of the Gander crash ... [and that] the Committee continues to be concerned that Arrow's financial status could be reflective of deteriorating management and maintenance capabilities." In its conclusion, the Report stated that

[t]he Committee fully recognized that there is significant doubt ... on the question of Arrow Air's capability to safely perform airlift missions for the DOD. Because the factors about which we are uncertain could contribute to cat-

---

**5.** A precise date is not provided in the record. *See,* however, the Declaration of General Duane H. Cassidy filed in support of defendants' opposition, ¶ 6.

**6.** MACR 70–1 (attachment 18, plaintiff's motion) sets forth the policy and procedures applicable in evaluating the capability and qualifications of

proposed civil airlift contractors for the DOD. Authority for MAC to conduct capability surveys is contained in MACR 70–1, ¶ 1.2, and in Part 9 of the Federal Acquisition Regulations (FAR), subpart 9.1.

**7.** Attachment 5, plaintiff's motion.

astrophic mishaps, it was determined that this significant level of doubt was unacceptable.... Therefore, after all deliberations, the Committee voted unanimously to find Arrow Air not capable of performing airlift services for the DOD.

Thereafter, on September 2, 1986, General Duane H. Cassidy, CINCMAC, issued a "Memorandum of Decision" which indicated that he concurred with the Committee's finding and determined Arrow to be "not capable". On that same date, by letter from Thomas F. Cygan, MAC's Contract Officer, Arrow was advised of CINCMAC's determination and provided with a copy of General Cassidy's memorandum decision. The September 2 letter from the Contract Officer also informed Arrow that, in consequence of CINCMAC's determination, its "proposal in response to the FY 87 MAC airlift services RFP [would] not be considered." Attachment 3, plaintiff's motion.

In response to the foregoing notice, Arrow directed a letter dated September 3, 1986, to General Cassidy requesting a meeting to review the matter and to determine the basis for CINCMAC's determination. Attachment 4, plaintiff's motion. MAC responded on September 4, 1986, by sending Arrow a copy of the Committee Report. Following receipt of the Committee Report, Arrow sent a second letter to CINCMAC responding in detail to the Report and requesting that the Report be "annulled", that Arrow be found capable, and that its proposal under the fiscal year 1987 RFP be considered and granted. In the alternative, Arrow requested that its letter be treated as a formal protest of CINCMAC's determination pursuant to the terms of the RFP.

The next day, September 5, 1986, members of the Committee met with Arrow representatives at MAC Headquarters, Scott Air Force Base, Illinois, to consider Arrow's written response to the Committee Report and to provide Arrow with an opportunity to present further information in support of its capability. As the entire Committee was not available for this meet-

ing, the members present decided that the full Committee should reconsider it earlier determination with respect to Arrow on the following Monday, September 8, 1986. On that date, the full Committee did reconsider the matter and voted nine to one to confirm the earlier finding of noncapability. Declaration of Lieutenant Colonel Lawrence N. Lacey, ¶¶ 8–10; Declaration of Colonel Reinhard M. Lotz, ¶¶ 21–22.

The reconsideration decision of the Committee, together with the supplemented record, was thereafter reviewed by CINCMAC who again concurred with the Committee's finding of noncapability. By letter dated September 17, 1986, Arrow was notified of CINCMAC's decision, advised that its protest was denied, and that its "proposal in response to the FY87 MAC airlift services RFP [would therefore] not be considered." Attachment 7, plaintiff's motion. This lawsuit followed.

The complaint alleges that CINCMAC's determination of noncapability terminated Arrow's eligibility to be awarded MAC contracts for fiscal year 1987 and that the determination is unlawful because it (1) deprived Arrow of its property and reputation without due process of law, (2) lacked findings based upon adequate evidence of record, (3) was issued in violation of applicable regulations, (4) was the product of unfair discrimination, and (5) resulted from improper Congressional influence. Complaint, ¶¶ 26–35. By way of relief, Arrow seeks a judgment declaring that MAC's determination is "void, improper, and illegal" and that Arrow is eligible to contract with MAC. The complaint also requests that MAC be permanently enjoined from enforcing its determination of noncapability with respect to Arrow. Together with the complaint, Arrow filed the motion for a preliminary injunction here under consideration.

Defendants have responded to this action with a combined motion to dismiss for lack of subject matter jurisdiction and opposition to plaintiff's motion for a preliminary injunction. In support of the motion to dismiss, defendants contend that this case

involves a pre-award contract claim which may be heard only in the United States Claims Court pursuant to 28 U.S.C. § 1491(a)(3). Defendants alternatively argue that, even if jurisdiction exists, Arrow has failed to make the requisite showing for an award of preliminary injunctive relief.

## ANALYSIS [8]

A preliminary injunction is an extraordinary equitable remedy that may be granted only upon a clear showing of entitlement. The standards for determining whether a party is entitled to such relief are well established and set forth in *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 259 F.2d 921 (D.C.Cir. 1958). Under that case, the Court must consider the following:

> (1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its [action]? ... (2) Has the petitioner shown that without such relief, it will be irreparably injured? ... (3) Would the issuance of a[n injunction] substantially harm other parties interested in the proceedings? ... [and] (4) Where lies the public interest?

*Id.* at 925. Since analysis of the first two of these factors disposes of the instant motion, the Court considers here only whether plaintiff has demonstrated that it has a substantial likelihood of success on the merits and will suffer irreparable harm absent the requested relief.

### Likelihood of Success on the Merits

■ The Court concludes that the facts in this particular case are such that Arrow is not likely to prevail on the merits of its claims. Arrow's principal argument is that the Government's action has deprived it of a constitutionally protected property or liberty interest without due process of law. Specifically, Arrow contends that the

Government's conduct amounts to a *de facto* debarment and that such action is unlawful because it was taken without affording Arrow prior notice of the "charges" against it and an opportunity for an evidentiary hearing culminating in administrative findings and conclusions based upon the record there made. This argument is simply not persuasive in light of the record before the Court.

Suspension or debarment of a government contractor is generally considered to be the administrative termination of *all* right to bid or contract with the Government or, at least, with that government agency with which a contractor has been doing business. *See e.g., Gonzalez v. Freeman,* 334 F.2d 570, 574 (D.C.Cir.1964); *ATL, Inc. v. United States,* 736 F.2d 677 (Fed.Cir.1984); *Art-Metal-USA, Inc. v. Solomon,* 473 F.Supp. 1 (D.D.C.1978). It does not appear that the Government's action in this case has had such an effect on Arrow. While Arrow claims that CINCMAC's determination of noncapability has deprived it of all opportunity to participate in future MAC contracts,[9] defendants maintain that the challenged decision has only rendered Arrow ineligible to participate in the fiscal 1987 CRAF contract for long range international airlift services which was the subject of RFP number F 11626–86–R–0030. The Declaration of General Duane H. Cassidy, CINCMAC, states in this regard that his determination of noncapability "does not foreclose favorable decisions on future similar proposals, proposals to non-DOD agencies, or proposals for DOD [contract] activities exempt from [CINCMAC's] authority." Cassidy Declaration, ¶ 16. Thus, MAC's noncapability determination appears limited in effect to rendering Arrow ineligible to bid with respect to only one contract;[10] and it does not appear from the

---

**8.** Defendants' motion to dismiss will be denied by separate order entered together with this opinion as the Court finds that it has subject matter jurisdiction.

**9.** In response to the Court's inquiry at the hearing on the instant motion, Arrow stated its belief that the challenged action precluded it from

participating only in those contracts let by MAC, and not from contracts issued by other DOD components.

**10.** Although the language used in both the Committee Report and CINCMAC's memorandum decision is broad and appears, when considered by itself, to preclude Arrow from participating

present record that Arrow has had bids on any other DOD contracts rejected based upon the challenged finding of noncapability. For these reasons, the Court concludes that Arrow is not likely to prevail on its claim that the Government action challenged here constitutes either a suspension or *de facto* debarment of Arrow which would give rise to any due process requirement for notice and hearing.

Even if the Government's action in this case were viewed as a suspension or debarment of Arrow, it is not clear from the body of relevant case law that due process would require that Arrow be provided with prior notice and hearing as alleged. The suspension and debarment cases do not recognize that a bidder has any constitutionally protected property interest in a government contract; rather, they recognize only that a contractor has a protected liberty interest at stake where he is deprived of the opportunity to bid based upon charges of fraud, dishonesty, or lack of integrity. In such situations, it has been held that the contractor may not be barred or eliminated from the procurement process without prior notice and an opportunity for a hearing on those charges. *See e.g., ATL, Inc. v. United States,* 736 F.2d 677 (Fed.Cir.1984); *Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953 (D.C. Cir.1980); *Gonzalez v. Freeman, supra; Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers,* 534 F.Supp. 1139 (D.D.C.1982); *Art-Metal-USA, Inc. v. Solomon, supra.* The instant action is distinguishable from such cases not only because Arrow has not been barred or eliminated from the procurement process, but also because the Government's action here is in no way based upon charges of fraud, dishonesty, or lack of integrity. In sum, Arrow does not appear likely to prevail on its due process claim.

■ There remain for consideration Arrow's claims that the challenged determina-

tion is unlawful because it (1) was not based upon adequate evidence of record, (2) was issued in violation of applicable regulations, (3) was the product of unfair discrimination, and (4) resulted from improper Congressional influence. The Court is of the view that Arrow is not likely to prevail on the merits of these claims either. It must be noted at the outset that the standard of review with respect to agency contract decisions is very narrow. The Court's role is "limited to determining whether the agency acted in accord with applicable statutes and regulations and had a rational basis for its decision." *Delta Data Systems Corporation v. Webster,* 744 F.2d 197, 204 (D.C.Cir.1984); *see also Old Dominion Dairy Products, Inc., supra,* at 960.

In this case, there is little question that the Government acted in accordance with its regulations and had a reasonable basis to support its finding of noncapability. The applicable procedure for evaluation of a contractor's capability is spelled out in Part 9 of the Federal Acquisition Regulations and, more specifically in the context of this case, MAC Regulation 70-1. It appears that defendants have complied with these regulations in all respects, notwithstanding Arrow's assertions to the contrary. Arrow claims that MAC violated a particular regulation [11] in making its capability determination by failing to consider the number of contracts Arrow had performed for DOD in a satisfactory manner; but this claim finds no support in the record, which clearly indicates that MAC considered Arrow's "past performance" in making its determination. *See* Report of the Contract Airlift Capability Survey Committee, Attachment 5, plaintiff's motion.

With respect to the substantive decision challenged here, it appears that defendants' determination is rationally based. Although the record before the Court does contain evidence favorable to Arrow, it also

in any DOD contracts during fiscal year 1987 (an interpretation which even Arrow concedes is not correct), the Court finds that General Cassidy's declaration resolves any doubt regarding the effect of his determination on Arrow's eligibility to bid on future DOD contracts.

**11.** FAR 9.104–3(c). That regulation provides, in pertinent part, that "the contracting officer shall consider the number of contracts involved and the extent of deficiency of each in making this evaluation."

contains other significant evidence, such as that pertaining to Arrow's financial condition, its recurring maintenance problems, and past accident experience, which supports CINCMAC's finding. On the whole, the Court cannot say that the Government's action here appears to be arbitrary and capricious or lacking a reasonable basis.

Before turning to the question of irreparable harm, a few words are necessary concerning Arrow's claims of improper Congressional influence and unfair discrimination. While it may be true that an agency's action is subject to invalidation where Congressional pressure is found to have "intruded into the calculus of considerations on which the [agency's] decision was based." *D.C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir.1971), the Court does not believe that Arrow is likely to succeed on this claim. Following the temporary suspension of charter activity with Arrow in February 1986, which admittedly occurred in the wake of the Congressional hearings on the Gander crash, MAC resumed operations with Arrow and continued them until the expiration of the fiscal 1986 contract. This circumstance weighs against any claim of undue Congressional pressure with respect to CINCMAC's noncapability determination. There is nothing in the record indicating that there was continued Congressional opposition to MAC's use of Arrow at the time CINCMAC made the decision challenged here, in September 1986; and General Cassidy has unequivocally denied that his determination was the product of Congressional pressure, or was influenced by political pressure from any source whatsoever. Cassidy Declaration, ¶ 12. Finally, with respect to Arrow's "unfair discrimination" claim, the Court can find no basis for review of Arrow's allegations of unequal treatment. The records of MAC actions concerning other charter air carriers are not presently before the Court and it appears that this claim is, as defendants suggest, nothing more than an attempt by Arrow to circumvent the standard of review applicable here under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

*Irreparable Harm*

Arrow alleges that the Government's action will result in the loss of approximately twenty-five percent of its projected gross revenues for fiscal year 1987 and that such a loss will irreparably harm Arrow by threatening its ability to reorganize under the bankruptcy laws and thus its very existence. Arrow further claims that its reputation will be irreparably injured by the challenged determination of noncapability. In support of these allegations, Arrow has filed the Affidavit of John N. Kempster, its Vice President for Planning. The Kempster Affidavit recites, in conclusory fashion, that CINCMAC's determination "threatens Arrow with imminent, irreparable harm ... [that] the denial of a substantial amount of income will adversely affect Arrow's efforts to successfully reorganize ... [and that] the determination of noncapability is having an irreparable and continuing adverse effect on Arrow's business reputation." Affidavit of John N. Kempster, ¶¶ 3, 4, 6.

While economic loss which threatens the very existence of a business may constitute irreparable harm, *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977), the party seeking preliminary injunctive relief must show (1) that such injury is "likely" to occur in the near future, and (2) that "the alleged harm will directly result from the action which the movant seeks to enjoin." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985). As the Court of Appeals observed in *Wisconsin Gas:*

> [b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur. The movant must provide proof ... indicating that the harm is certain to occur in the near future. [Emphasis in original]

*Id.* at 674.

Arrow has failed to make the requisite showing. First, there is no proof in the record that Arrow's Chapter 11 reorganization efforts will fail in the near future in the event Arrow does not obtain the 1987 successor contract for international airlift

services from MAC. The Kempster Affidavit, containing nothing more than conclusory allegations to this effect, is speculative and insufficient. No information regarding the status of the reorganization proceedings has been provided which would enable the Court to determine whether the alleged harm will "in fact" occur, or when it may occur if at all. Secondly, even if it did appear that failure of Arrow's reorganization efforts was both likely and imminent, there has been no showing that such failure could be attributed to Arrow's loss of the 1987 MAC contract. The fact that Arrow filed its bankruptcy action "last winter", well before the economic loss complained of here occurred, is evidence that the company's financial distress is attributable to causes other than the loss of its MAC contract. Similarly, there has been no showing that the alleged damage to Arrow's business reputation is attributable to CINCMAC's determination, rather than to the publicity Arrow obtained following the tragic accident at Gander.

For the foregoing reasons, plaintiff's motion for a preliminary injunction must be denied. An Order consistent with this Memorandum Opinion will be entered this date.